COALE, *et ux. vs.* BARNEY, *et ux.*—December, 1829.

Upon a merely equitable estate, no writ of partition can be maintained at law.

A failure to comply with an engagement to do a mere nugatory act, ought not to impair the rights of a complainant in equity to relief, when the facts of his case, otherwise concur, to sustain his bill.

An agreement was entered into, on the 27th November, 1813, between the *cestui que trusts* for life, and remainder in fee, and the trustee, of a certain trust estate, held by the latter in fee, the object of which was to lease out

the trust property then unimproved, aud secure to the *cestui que trusts* in remainder, an immediate participation in the rents. For that purpose it was agreed, that the trustee should appoint an agent, to make leases for ninety-nine years, with liberty of renewal, *for such rents as should be thought reasonable by the parties interested,* payable annually during the terms, to the agent in trust, as follows :—viz. one half to one *c. q. t.,* in remainder, during her life; and after her death, to her children, their *executors and administrators;* one fourth to another *c. q. t.,* in remainder for life, with a similar reservation to her children, &c. The other fourth, to the *c. q. t.* for life, during her life, and after her death to the last above mentioned *c. q. t.* in remainder, her *executors and administrators.* On the 29th September, 1823, a bill was filed by two of the *c. q. t.,* against the third, for a specific execution of the agreement, upon the ground that the defendant, since the year 1818, had prevented the execution of the leases, and refused to do any act, towards carrying the contract into effect. This charge being established, and it appearing that the parties were near relations, and that the complainants had made frequent efforts for an amicable arrangement, IT WAS HELD, that there was an adequate consideration to support this agreement, for the violation of which damages to the full extent of the injury sustained, might be recovered; that the complainants had not slept upon their rights in such a way, as to shew the contract had been abandoned ; that Chancery has power to grant adequate relief, which could only be done by providing the means, necessary to carry into effect the leading object of the parties, the leasing the property at reasonable rents ; and that in doing this, it was the duty of the court, to gratify the minor provisions of the agreement, so far as it could be done consistently, with the accomplishment of the grand design.

The defendant, in this case, was deemed to have forfeited the right of fixing the reasonableness of the rents, to be reserved in the leases referred to in the preceding contract, by shewing her determination to act in such a way, as to render her exercise of that right wholly inconsistent with the relief due to the complainants, and her right was therefore transferred to a trustee appointed for the purpose of executing the agreement ; which trustee was enjoined to execute leases, for such rents, as he, together with the complainants, should think reasonable.

Where an agreement contains provisions, which, by reason of some technical principle of law, cannot be carried into effect, according to its literal import, it is the duty of a court of equity, for the sake of the intent, to give it that construction which the rules of law will tolerate; and the intention of the parties, to be collected from the whole instrument, will justify.

So the interests of the *cestui que trusts,* in remainder, in the property referred to in the preceding agreement being real, and not personal estate, and as such, could not be limited to their *executors and administrators.* The court decreed the rent to be paid to the *c. q. t.* and their *heirs,* and this as to all the parties entitled to such rents.

APPEAL from the Court of Chancery.   The bill, which was filed on the 29th of September, 1823, by the appellees against the appellants, and *Hannah Kitty Chase,* stated that *John Eager Howard,* by his deed of conveyance, bearing date the 28th February, 1793, did convey to *William Paca,* a certain lot of ground, situate in the city of *Baltimore,* upon the terms and conditions of the exhibit A, hereinafter set forth.   That after the execution of the said deed, and in the life time of *Samuel Chase,* his daughter *Eliza Chase* intermarried with *George Dugan* and *Mary Chase,* the female complainant intermarried with *William B. Barney,* the other complainant.   After which, *Samuel Chase* died, and on the 2d of October, 1813, *George Dugan* died intestate, and without issue of the body of his wife *Eliza.*   That *Eliza,* his widow, acquired in her right as his wife, a large amount of property, which placed her in very comfortable, if not affluent, circumstances.   That *Mary,* the female complainant, having several children, and being in straitened circumstances, owing to the misfortunes of her husband in commerce, the said *Eliza* and *Hannah Kitty Chase,* the mother of *Eliza* and *Mary,* being desirous of bringing the said property into immediate action and use, and for the benefit of all parties interested in the same, which would otherwise have remained useless, both to *Eliza* and *Mary,* during the life of their mother, did, together with *John P. Paca,* the son and heir of *William Paca,* and to whom the trust aforesaid had descended by the death of his father, and with the complainants, execute an instrument of writing, whereby they agreed and covenanted to and with each other respectively, according to the terms of the exhibit B, hereinafter set forth, a copy of which was filed with the bill, and the original of which was to be produced when required.   That *Eliza Dugan,* about the 29th of January, 1818, intermarried with *Skipwith H. Coale,* and she has since wholly refused to do any act whatever, towards carrying into effect, the agreement and covenant aforesaid, and hath actually notified *John P. Paca,* and all the other parties interested, that she will never consent that the same shall be carried into effect.   That in consequence of such, her refusal to comply with her said agreement, such

persons as are desirous of taking leases upon the said lot of ground, have been and still are deterred from doing so; and *John P. Paca* being but a trustee, and knowing that *Eliza* is in justice and equity bound to fulfil her agreement and covenant, is yet unwilling to incur the hazard which he apprehends from executing the power of attorney aforesaid. That by the bad faith and refusal of *Eliza,* the complainants are greatly damnified, and scarce possess the means of providing for the subsistence, much less for the education of the children of *Mary.* That she and her sister *Eliza* were educated and entered life together, and *Eliza,* at the time of executing the said contract, and until her last intermarriage, was altogether childless; while *Mary,* who is the youngest sister, was the mother of several children, and hath since had several others, for whose maintenance and education, tenderness and duty alike have always heretofore, and now doubly prompt her to provide. The bill had a general interrogatory, and also a special one as to *Eliza's* conduct, and whether she did not execute the aforesaid agreement in manner and form, and under the circumstances aforesaid, and prays that *Eliza* may be compelled to do all such acts in the law as may be necessary specifically to put into execution her contract or agreement aforesaid, according to its true intent and meaning, &c. The bill also prays for all relief proper in the premises.

The *Exhibit A,* is a deed from *John Eager Howard* to *William Paca,* dated the 28th of February, 1793, whereby in consideration of the sum of five shillings, the said *Howard* conveyed to the said *Paca,* his heirs and assigns forever, all that part of a parcel of a tract of land called *Lunn's Lot,* beginning for the said part at, &c. containing 2 1-8 acres of land. To have and to hold the following part of the said parcel of land beginning, &c. containing one half acre and one thirty-second part of an acre of land, unto the said *Paca,* his heirs and assigns forever, in trust to and for the uses, &c. that is to say: In trust for the use and behoof of *Samuel Chase* and *Hannah Kitty Chase* (wife of the said *Samuel Chase*) for and during their joint natural lives, and the life of the survivor of them; and after the death of the said *Samuel*

and *Hannah Kitty*, to have and to hold one undivided moiety or half part of the said land and premises, in trust for the use and behoof of *Eliza Chase*, daughter of the said *Samuel* and *Hannah Kitty*, and the heirs of the body of the said *Eliza Chase*, and to have and to hold the other undivided moiety or half part of the said land and premises, in trust for the use and behoof of *Mary Chase*, daughter of the said *Samuel* and *Hannah Kitty*, and the heirs of the body of the said *Mary Chase*; and in case of the death of either *Eliza* or *Mary* without issue, cross remainders between them in tail, and with remainders over to *Samuel* and *Thomas Chase* (sons of the first mentioned *Samuel*) in distinct halves in tail, with cross remainders in tail between them; and with final remainders to *Ann Chase* (daughter of the said *Samuel*) as to one half, and to her heirs in fee simple; and, as to the other half, to *Matilda Ridgely* (another daughter of the siad *Samuel*) in like manner. To have and to hold all the residue of the said part of the parcel of land, first above mentioned and described unto the said *Paca*, his heirs and assigns forever, in trust to and for the several and same uses, intents and purposes before mentioned, of and concerning the part of the said parcel of land last above mentioned; and on the further trust, &c.

The *Exhibit B*, is an agreement entered into on the 27th of November, 1813, between *John P. Paca, Hannah Kitty Chase, Eliza Dugan, William B. Barney* and *Mary* his wife, reciting that " *John P. Paca* is at this time seized in fee simple, in trust for the said *Hannah Kitty Chase, Eliza Dugan* and *Mary Barney*, of and in a certain piece or parcel of ground, in the city of *Baltimore*, fronting on *Lexington street*, the breadth of 175 feet, and on *Eutaw street*, 186 feet, and binding westwardly on *Walshes alley*, and on the south with an alley called *Chases alley*, which piece or parcel of ground is at present unimproved. And whereas, it is thought by the parties interested, that it would be for their mutual benefit, that the said property should be divided into lots, and demised for ninety-nine years, with liberty of renewal, for such rents as may be thought reasonable by the parties interested, to be reserved by the said leases, payable annually during the said terms. And

whereas, by reason of the distance of the said *John P. Paca's* residence, from this city, it would be inconvenient for him to execute the said leases, and to attend to the collection of the said rents, now, therefore, these articles witnesseth, that the above mentioned *John P. Paca*, *Hannah Kitty Chase, Eliza Dugan* and *William B. Barney* and *Mary* his wife, have mutually and separately for themselves, their heirs, executors and administrators, agreed and covenanted, to and with each other, respectively, and to and with their respective executors and administrators, that the said *John P. Paca* shall, and will, by a good and sufficient power of attorney, by him duly executed, constitute and appoint *Cumberland Dugan*, of the city of *Baltimore*, his attorney, for the purpose of executing such leases, and giving thereby full power and authority so to do. In which leases, the rents shall be reserved to be paid to the said *Cumberland Dugan*, his executors or administrators, in trust for the said *Hannah Kitty Chase, Eliza Dugan* and *Mary Barney*, in the following proportions: In trust as to one half of all such rents to be paid to the said *Mary Barney's* sole and separate use, during her life, annually, to her, and after her death to be paid to her children, their executors or administrators, in equal shares; to be discharged, during her life time, by her receipt," &c. And as to one fourth part of the said rent, in trust to be paid to the said *Eliza Dugan*, her executors and administrators. And as to the other fourth part, in trust to be paid to the said *Hannah Kitty Chase*, during her life, and after her death, to the said *Eliza Dugan*, her executors," &c. Signed and sealed by all the said parties.

The only answers material, were those of *Coale* and wife. They answered separately. *Coale* answers as to his hearsay and belief, that *Mrs. Chase* had not performed the consideration, on which the said agreement was founded,—that of barring the entail of the said lot or parcel of ground, by uniting in a conveyance ; that she had made leases of the ground in question ; that *Barney* and wife had mortgaged their estate in it, and that the agreement had been abandoned. *Mrs. Coale* in her answer alleges, that her mother agreed, but now refuses to unite with the other persons

having the remainder in tail, to bar the entail, which was the consideration of the agreement of leasing. That the agreement, except upon that consideration, was without inducement or consideration at all. That she had notified her opposition to the leases of the property, because her mother had violated the understanding on which the agreement was entered into. That she has children now, and that she offered to let the agreement be executed, if she should be allowed one half of the three-fourths of the rents.

The complainants and defendants counsel on these answers coming in, ordered the register " to file the general replication," and to issue a commission to a person named by them. An agreement was entered into, to set the cause down for hearing at December term, 1825, with liberty to either party to examine witnesses under a commission.

BLAND, Chancellor, (December term, 1825.) It appears from the proceedings, that the articles of agreement mentioned in the bill of complaint, bearing date on the 27th of November, 1813, ought to be specifically performed and executed, according to the true intent and meaning thereof, as prayed.—*Decreed*, that *Cumberland Dugan* be, and he is hereby constituted and appointed a trustee for the purpose of executing and performing the said agreement; and the said trustee, shall immediately proceed to make such a lease or leases, of the piece or parcel of ground described in the said articles of agreement, in such manner and upon such terms as he shall deem most advantageous and beneficial to all the parties concerned and interested in the same. In which lease or leases the rents shall be reserved, and made payable unto the said trustee, his heirs and assigns, in trust for the said *Hannah Kitty Chase, Eliza Coale,* and *Mary Barney* in the following manner, to wit. In trust, as to one half of all such rents, to be paid to the said *Mary Barney's* sole and separate use, during her life annually to her, and after her death to be paid to her children, their executors or administrators, in equal shares; to be discharged during her life time by her receipt, &c. And as to one

fourth of the said rent, in trust, to be paid to the said *Eliza Coale,* her executors and administrators. And as to the other fourth part, in trust, to be paid to the said *Hannah Kitty Chase* during her life, and after her death to the said *Eliza Coale,* her executors, &c. *Decreed* also, that *Coale* and wife pay all the costs of this suit. From this decree, *Coale* and wife appealed to this court.

The cause was argued before EARLE, MARTIN and DOR-SEY, J.

*Mayer,* for the appellants, insisted. 1. That the agreement for leasing the property was inoperative, and could not be regarded by a court of equity. 2. That the bill, answers and proceedings, do not present a case fit for the cognizance or specific interposition of Chancery. 3. That it was the duty of the complainants to allege the equitable merits of their claim—leaving no doubt of those merits. 4. That the bill shows no equitable right; and the answers of the appellants, rebut all pretensions of the bill. 5. That upon the bill, answers and proceedings, the decree was erroneous.

1. The answer of the defendant *Mrs. Coale,* is strictly responsive to the bill; and although there is a general replication, and no testimony taken, yet it was incumbent on the complainants to prove their case. The case must be considered on the bill and answers. The complainants must satisfy the court, that the agreement to be enforced is liable to no suspicion, and equitably fit to be carried into effect. 2 *Pow. on Cont.* 222. *Seymour vs. Delancey,* 6 *John. Ch. Rep.* 222. 1 *Madd. Chan.* 321.

2. The agreement cannot be enforced. It depended on the discretion of *Mrs. Coale,* whether she would carry it into effect, or not. Equity can have no cognizance of it. The agreement gave *Paca* no more authority than he before possessed. He had no power to lease. For the non-fulfilment of the agreement none but nominal damages were sustained. Voluntary covenants are not to be enforced in equity, 1 *Madd. Chan.* 321, 327, 328. *Minturn vs. Seymour,* 4 *Johns. Ch. Rep.* 497. Nor

in any case, where none but nominal damages can be recovered at law. 1 *Madd. Chan.* 288, 321, 328. *Stapilton vs. Stapilton,* 1 *Atk.* 10. Here only nominal damages would be recovered for refusing to permit *Dugan* to be appointed an attorney to make the leases. It was only a covenant for the delegation of a power. How could a decree be made to enforce the agreement? It is true, the Chancellor has passed one, constituting *Dugan* the attorney to execute the leases; but it is wholly inequitable. *Mrs. Barney* is one of the complainants. She makes no concession, and has no right to call for the execution of the agreement.

3. But there has been laches fatal to the complainants' case. The agreement was entered into in 1813, and the bill was filed in 1823. Specific performance will, therefore, be refused. 1 *Madd. Ch.* 239, 330. *Marquis of Hertford vs. Boore,* 5 *Ves.* 720 (*note* 6.) *Guest vs. Homfray, Ib.* 818, 822.

4. There is no allegation in the bill that the property could be leased upon advantageous terms.

5. The answer of *Mrs. Coale* is separate from that of her husband. Husband and wife must answer jointly. *Cooper's Plead.* 24, 30.

*Winchester,* for the appellees. The whole of what has been urged, by the counsel of the appellants might be admitted, as having nothing to do with the case before the court. The defendants who resisted this proceeding, must sustain their case by proof in support of their answers. The answers are not responsive to the bill. The agreement is a common one to change the situation of the title to the property. It is a contract for a valuable consideration. The interest in the property was in *Mrs. Chase* during her life; and she and her daughters with a full knowledge of the subject, executed the agreement. There is no remedy for enforcing it, unless it can be enforced in equity. The court of chancery can enforce this contract. 1 *Madd. Ch.* 286. If the allegations in *Mrs. Coale's* answer, were all proved, yet they have nothing to do with the claim set up by *Mrs. Barney,* to have the agreement carried into effect. But there

is no proof of any of the allegations in the answer of *Mrs. Coale.* The agreement is admitted—there is no suspicion of its improper execution.

But it is urged that the complainants have sustained no damage, or if any, only nominal damages. Suppose at law, it was proved that the property could have been leased for $1,500 or $2,000, but for the objection of *Mrs. Coale* to execute the agreement, would *Mrs. Barney* be turned off with nominal damages. It is also alleged that there is no equity set forth in the bill. This is never done where it is for a specific execution of a contract, as the contract is to speak for itself. The non-execution of the contract is shown by *Mrs. Coale* in her answer, shewing, that she prevented its execution. It is admitted that voluntary covenants or contracts are not enforced in equity ; but it is denied that this is a voluntary contract within the meaning of, 1 *Madd. Chan.* 321, 327.

It has been said that the complainants have been guilty of laches. This must depend upon all the circumstances of the case, and the connexion of the parties to each other.—Here were sisters, who no doubt, were not desirous of going to law, It is not similar to the ordinary cases, of persons wholly unconnected by relationship. It is not a contract of purchase and sale ; but it is a family compact in which all had a right to move. Forbearance, therefore, was a duty, and it was meritorious. *Mrs. Coale,* in her answer, shows that the subject was constantly a source of correspondence between her and her sister, &c. and that a new agreement was at one time in agitation.

*Taney,* (Attorney General) and *Mayer* in reply.

1. The court will observe that the real estate in question in the cause stands conveyed to *Mrs. Chase* for life, with remainder as to one moiety to *Mrs. Coale,* the appellant, in tail general, and as to the other moiety to *Mrs. Barney,* the appellee, also in tail general. The leases contemplated by the agreement, which is sought to be enforced, reserve one fourth of the rents to *Mrs. Chase* for life, another fourth to *Mrs. Coale,* and

" *her executors and administrators,*" and the remaining half to *Mrs. Barney* for life, and to her children, and their executors and administrators after her death, and reserving further to *Mrs. Coale* and her " *executors and administrators,*" after *Mrs. Chase's* death, the part of the rents secured to *Mrs. Chase.* The result of this prescribed reservation of rents is, that *Mrs. Coale* has only a life estate in the rent assigned to her, and that after her and *Mrs. Chase's* deaths, the rents as to one half, will *entirely cease,* neither accruing to the children of *Mrs. Coale* as her heirs, nor devolving upon *Mrs. Barney* or her children, by force of any constructive limitation, and the tenant will enjoy half of the ground free of rent. *Co. Litt.* 47 a. 2 *Roll. Abr.* 289, 450. *Dyer* 45. 12 *Co.* 35. *Cro. Car.* 290. This is manifestly a most unreasonable stipulation, and so glaringly unjust to *Mrs. Coale and her children,* that we presume the court will not effectuate an agreement, that involves such *a forfeiture of prior admitted rights.* If *Mrs. Coale* had an estate tail general in the land, the rents in all fairness ought to be co-extensive with such an interest, and any retrenchment, *especially one which injures her without benefiting the other parties,* must be pronounced inequitable in the agreement under consideration. We are told, that " every agreement to merit the interposition of a court of equity in its favor, must be fair, just, reasonable, bona fide, certain in all its parts, mutual, useful, made upon a good or valuable consideration, not merely voluntary." 2 *Powell Contr.* 221. 3 *Ves.* 420. 4 *Ves.* 480. 9 *Ves.* 608. Now, regarding the ineffectual reservation of rent as to *Mrs. Coale,* if this agreement be tested by the rule we have stated, it will be found without any of the equitable qualities, that agreements must have to be countenanced by this court and specifically enforced. Can it be said to be " *fair, just and reasonable,*" that *Mrs. Coale* and her children should be thus cut off from the substance, of nearly her whole estate in this land? If not—where, looking to the other elements of the rule, can it be shown that the agreement in this respect, is " mutual," or has a good, and valuable consideration? Can it be urged that the enjoyment of one fourth of the rent for her mother's life, is any equivalent for the privation of valua-

ble estate in tail general, and *the disinheritance of her children?* The suggestion will not bear an argument.—By all the principles then that govern the jurisdiction of the court in such cases of specific performance, this agreement cannot be sustained and carried into effect according to its terms, and the court must consequently repudiate it unless they have some power paramount to the literal terms of the writing, by which they may give it effect without doing the injustice we have spoken of. Have the court this power of substituting phraseology, and decreeing, as if the agreement reserved the rent conformably to the estate—*to Mrs. Coale and her heirs?*

We are told that courts of equity can no more *make* contracts for men than courts of law. Lord *Mansfield, Hotham vs. East India Company, Doug.* 277. The construction of a contract is all that courts of Law, or even of equity ever pretended to;—not the formation of contracts. Courts of Equity, acting as to the *form* and *mode* of giving effect to contracts may be supposed to have gone the length of even devising new contracts, so as to bring into operation the so called spirit of the contract. But it will be found, that the contract in its prescribed boundaries is the text which they respect, and although courts of equity assume a discretion as to the mode and form of assuring the benefit of the contract, the sphere of that benefit is always *the express and defined scope of the contract itself.* It is true that courts of Equity in regard to *charitable uses,* exercise a sort of controling discretion, and execute the *general* intention of the party, as denoted, without any regard to limitations or any of his *specific views,* where the statute opposes them. But this power is given by the statute of charitable uses, or derived from it, at least, by construction. At common law, no such power is asserted in any judicature. The *cy-pres* preformance of conditions, for instance, does not presume to transcend the *express limitations*— but the doctrine simply requires that so much of the assigned condition as can, shall be fulfilled—but it sanctions no constructive equivalent—no discretional substitution. The most obvious and noted instances of the seeming departure of courts of Equity, from the terms of contracts in dictating specific per-

formance, are cases of marriage settlement.    1 *Newl. Cont. Ch.*
19. *Pow. Con.* 40. But on examination it will be found, that the
courts do not there enlarge or contract the scope of the benefit
*as declared and defined* by the contract—or increase or diminish
the persons or objects to be benefited, as explicitly set forth by
the contract itself.    Thus where there is an agreement in con-
sideration of marriage, to settle an estate on the husband
and the heirs of his body from the marriage, a Court of Chance-
ry very properly esteem the children of the marriage within the
marriage consideration, and included in the " heirs of the body,"
and, inferring that those heirs are to be benefited, (*just as the
common law in all estates tail infers,*) an agreement of such a
tenor, is executed in Chancery by a strict settlement on the hus-
band, and his sons and the heirs of the body of such sons.    But
here, and so in all the instances in the books, the court acts with-
in the range of the expressed contract; its test being that it shall
have no occasion to superadd any thing to the contract in order
to consummate it;—and adopting the safe principle, that the
court shall not take upon itself the *sentiments*, and identify itself
with the *situation* of the party, but interpret his views as his
words denote and limit them in his contract—when all fair
equitable circumstances concur to incite it to act at all.

Courts of equity have the same principles that Courts of
law acknowledge in defining and circumscribing their discre-
tional power ; but acknowledge the actual convention of the
parties as the only subject of their consideration, and its declar-
ed scope, therefore, as marking out the latitude of their discre-
tion.    And without the principles which have been asserted, no
such thing as a defined contract can exist, and judicial power
will supersede all private right, and judicial discretion be desul-
tory and boundless.    Now, if the agreement in question in this
cause were silent as to the appropriation of rents, equity, accor-
ding to common law itself, would give them to the holders of
the estate.    But here the terms of the leases in this particular
are unequivocally limited—and no other appropriation can be
made that will not contradict the express reservation.    *Expres-
sio unius est exclusio alterius.*    The conclusion, therefore, must

be that the court cannot add, or interpolate, any words to give the contract a just and legitimate effect; and, unable to execute it as it exists with all the inequitable consequences it now involves, they will leave it, to avail as it may at common law.

2. There is another circumstance which appears to us conclusive against the interference of the court for the specific performance of this contract. The citations we have made show that a contract, to be entitled to specific performance, must be *mutual*—all parties must be bound to perform it.—To use lord *Eldon's* words, 2 *Powell,* 232, 234. 4 *Ves.* 849, "*all* parties must be bound, or none."—Now, how stands this point of reciprocal co-equal obligation in regard to the present agreement? The agreement is between *Mrs. Chase—Mrs. Barney and her husband*—and *Mrs. Coale,* while a widow. Will it be said that *Mrs. Coale* could legally, or even equitably, enforce this contract against *Mrs. Barney, whose proper estate was the subject of her (Mrs. B's) engagement?* It is the *legal* liability that is the test of the proper mutuality; but at all events, equity follows the law in the case of a married woman's agreement, who has no *special disposing power* given her under which she may make it. Besides, too, where no damages are recoverable at law on a contract, equity will not enforce it—and upon that principle alone, then, the contract could not be enforced in equity against *Barney* and wife. 2 *Powell,* 242, 252.

It may be said that this latter principle is too generally stated—but it will be found substantially correct. The only exceptions to the rule in its literal scope, being where the inability to recover on the contract at law, arises from want of form in the contract,—or where the relation between the party claiming and the party liable makes a suit technically impracticable, as in case of husband and wife. 2 *Powell,* 17.

Here there is a manifest want of the mutuality which is an essential property of all contracts that may be specifically enforced in equity. With that, too, falls all idea of a due *consideration* for the agreement. If *Mrs. Barney* could not be compelled to execute the contract, how oppressively unequal is *Mrs. Coale's* situation, if she is to be held liable;—and where then is

the consideration for her being so? *Mrs. Barney* and *Mrs. Coale* held together the estate in the land, equivalent to a fee simple—and without *Mrs. Barney's* estate being brought into action, the agreement would be entirely inoperative.    There is no ground to say, and can be no pretence, that *Mrs. Barney* had any peculiar disposing power over this estate beyond that which a *feme covert* has over any estate which she may have owned before marriage.  This property was not even settled to her " *separate use*," in terms or effect ;—which is necessary to make it equitably her separate property—that is: so as to give her any right to deal with it as if she were a *feme sole*.   But in regard to *real estate* even thus made separate property, a power must be expressly reserved to the wife of disposing of it as a *feme sole*, else she has no special privilege in that respect. Now in this case, *Mrs. Barney* had before her marriage a trust estate in tail general—of which she had no more right to dispose, except by *deed* with her husband and upon private examination, than if it were her legal as well as equitable estate.  It is established that equity recognises no distinction between trust and legal estates in land in reference to *femes covert* or tenants in tail, or in any respect whatsoever where no special power of appointing is given by the assurance to the wife, or there be not some  express and unequivocal stipulation to make the case an exception.    If *Mr. Dugan had made leases under the agreement they would have had no validity as to Mrs. Barney's interest, she being committed in them only by her agreement.   If such would have been the case under the agreement, is there any ground for complaint that Mr. Dugan did not proceed to make these futile leases? and where then is the mutuality and consideration in reference to Mrs. Coale?*   And it may be asked, if the *agreement* would have authorised no valid leases as regards *Mrs. Barney's* interest, how can the decree of Chancery produce such effect, resting as it does on the efficacy of the contract alone, which, in the particular of *Mrs. Barney's* interest, is intrinsically nugatory.

3. There must be great difficulty in framing a decree to carry this agreement into effect.   Indeed no decree, consistent-

ly with the agreement, *can* pass, that shall be absolutely *compulsive* against *Mrs. Coale's* interest, *or paramount to her and her husband's private judgment,* as to the expediency and acceptance of the leases that may be proposed. The agreement refers to leases that reserves " *such rents as may be thought reasonable by the parties interested.*" There is no doubt that Courts of Law and of Equity may judge of the reasonableness of considerations—but in no case can they exercise that authority where the "*point of reasonableness is expressly referred to the judgment of the individual, and especially the interested individual.*" If the stipulation had been simply that " *reasonable rents*" should be reserved, the court might, no doubt, have determined the reasonableness. But that is not the stipulation in this instance.—And here the court, if they act at all on this agreement, must not only take from the party the right of judging the reasonableness of the rents, *but, not even themselves exercising it, they must delegate it to a stranger—and make his judgment the imperative rule of our private interests.* The case, in this its essential aspect, involves grave and momentous considerations which, *touching the high and sacred rights of individual property,* must be obvious to the court, and will, we are assured, induce them to pause on the question of their jurisdiction—and however *in the abstract* they may deem that *the parties* ought to execute the agreement specifically, they will, and must, consider as a point of solemn interest how far they can, within their legitimate province, devise a mode of *adversely* executing it—and how far they may set aside the right of the individual's discretion, which is reserved in the contract as part of that disposing power of her property, consecrated by the Constitution and the first principles of natural justice.

**Dorsey, J.** delivered the opinion of the court. Against any decree for the specific execution of the agreement mentioned in the proceedings in this cause, many distinct and independent grounds have been relied on, by the solicitors for the appellants. First, it was contended that the refusal of *Hannah Kitty Chase,* as alleged in the answer of *Eliza Coale,* to perform her promise

of uniting for the purpose of docking the estate tail; (which promise, it is said was the main inducement with *Eliza Coale*, to enter into the contract,) is sufficient to induce the court to withhold that relief which it might otherwise have been dis- posed to grant. Without deciding the question so warmly contested in the argument; whether the answer, without further proof, can sustain a defence thus founded on new, and as it were independent matter, (which it unquestionably could not, unaided by the unsafe and unusually comprehensive interroga- tory in the conclusion of the bill of complaint,) it is sufficient to say, that this ground of resistance, is swept from the appel- lants, by the decision of this court in the case of *Newton, et al. vs. Griffith, et al.* 1. *Harr. & Gill*, 111, which determines that estates tail, to the heirs of the body generally, created after the first of January, 1788, are, by the operation of the act of descents, converted into estates in fee simple absolute. And this case cannot evade the rule thus established by the fact, that in *Newton and Griffith*, the question arose on the legal title to land, here the principle is to be applied to an equitable interest. In this respect equity must follow the law. The alleged promise of *Hannah Kitty Chase*, to unite in docking the entail, was therefore an engagement to do a nugatory act; her failure, to comply with which, ought not to impair the rights of the appellees.

It can hardly be necessary to notice one of the objections relied on: that a Court of Chancery cannot enforce the contract against *Eliza Coale*, because it was wholly voluntary on her part; as she was to receive no consideration for her agreement to lease. If it be "no consideration" that the mother, a tenant for life, transfer one half her interest to her daughter, in pro- perty to which the daughter was entitled in remainder, to obtain the daughter's assent to such an improvement of the property, as would (for aught that appears in the record) produce inconvenience or loss to no person interested; but was indispensable to any beneficial enjoyment of it by the mother; it is difficult to conceive, what, in such a case, would be re- quired, as an adequate consideration.

We are told by the appellants solicitor, that the great depreciation in real property, and especially in the city of *Baltimore,* is matter of public history, of which the court must judicially take notice, and that, although a regard to her own interest, might prompt *Eliza Coale* to agree to lease in 1813: yet the state of things is now entirely changed, and to enforce the agreement at this time, would be subjecting her to great hardship and loss. The condition of this country, in 1813, and a few years afterwards, was an accidental and unnatural one; the like may not again occur for centuries, and it is matter of sheer speculation and great doubt, whether the interest of all concerned would not be promoted by an immediate leasing of the property. But if there be hardship and loss in the case, to whom is it to be imputed? To *Eliza Coale,* whose refusal to perform her agreement, prevented the execution of leases, when rents had reached their most unreasonable height. Had she not thus refused, from that transfer by her mother, which is now called " no consideration," she would have received in rents, up to this time, a sum of money, greater in amount, than the entire value of her present interest in the property: and, independently of rents received, her interest in the property would now have been four times as valuable as it is. In this she is not the only sufferer. But the consequences of this controversy are now visited, in a much higher degree upon her sister, *Mrs. Barney.*

It was also urged, that by another rule of chancery jurisdiction, the appellees were prevented from obtaining the interposition of a Court of Equity: viz. that where a party had a complete remedy at law, (as might here be had by a writ *de partitione facienda:*) or where nominal damages only could be recovered at law, a specific execution of the contract will never be decreed. In answer to this it may be replied, that the rule referred to has no application to the case before us. It does not appear that the lot of ground is susceptible of a division into moieties; and if it were, even if no life estate intervened, the estate of the appellees being merely equitable, no writ of partition could be sustained at law. That if it could, the condition

of the parties, under such a proceeding, would be different from what it would be under the agreement. If partition were made at law, 'tis true, that *Barney and wife*, with *Hannah Kitty Chase*, might (as is stated) lease a moiety of the ground, for ninety-nine years, renewable forever, reserving the rent to *Mary Barney* and her heirs; but, *non constat*, that she would be willing to do so. She might with convenience assent to giving her daughters three-fourths of the rents, reserving her life estate in the remaining fourth: yet it by no means follows, that she could conveniently bestow upon one daughter the entire rents of one half of the property; whilst the other half, in its unimproved condition, continued on her hands destitute of value. That so far from nominal damages only, being recoverable, for such a violation of contract, damages to the full extent of the injury sustained by the appellees, would certainly be recovered.

Another ground more strongly relied upon against the appellees is, that they have slept upon their rights, in such a way as to shew that the contract was abandoned. And many cases have been referred to, between vendors and vendees of real estate, in which a Court of Chancery has denied all aid to those, who have not been vigilant and active in asserting their rights; or, in the language of some of the cases, who have not been always " ready, desirous, prompt and eager," to comply with their portion of the contract, and to enforce on the other party, a like compliance with its stipulations. A contract to lease, say they, is to all beneficial purposes a sale; its effects being the same. This position would not be denied, if this controversy were between a lessor and lessee; nor would the conclusiveness of the authorities cited be questioned, if this were a case between vendor and vendee. The justice, the policy of this rule is most obvious; the grossest frauds and injustice would be practised, if it did not prevail. But for this, stale contracts virtually abandoned, though not formally released; in case of a sudden rise or fall in the value of the thing contracted for, would be set up, and the party complainant would unfairly gain what the party defendant would unjustly lose : an amount precisely equal, to the appreciation

or depreciation which the property had undergone ; could that, in any event, be the predicament of the parties to this suit? Certainly not. As regards enhancement or diminution of price, their interests are homogeneous, inseparable; profit or loss can happen to neither, without a proportionate participation by both. Except in the class of cases adverted to, no authority has been produced to shew that for such laches and under such circumstances, as are before us, relief has been denied under the presumption of a waiver or abandonment of the contract. The delay of the appellees, in proceeding to assert their rights, is considerable; but it is satisfactorily accounted for, and the weight of the objection entirely fails when we reflect on the near relationship of the parties concerned, and look to the answer of *Eliza Coale,* and see what efforts were made to effect an amicable arrangement of the dispute, and that the door of negociation is still open, and that this implied abandonment of contract is no where insisted on in the answer.

The answer does not state, nor has any proof been offered to shew, that the consummation of this agreement will work any particular hardship upon the appellants, or subject them to loss, inconvenience or sacrifice of any description. Why then, these appellants should persist in a course of conduct, by which they have already lost in rents, more than the value of their whole interest in the property, is inconceivable. The hardship of the case lies altogether on the other side. A large lot of ground, as is stated in the agreement, lying "in the city of Baltimore" "unimproved:" owned by a mother for her life, with remainder in moieties to her two daughters in fee, is kept in a situation to be of no annual value to any of them, by the refusal of one of the daughters to permit its improvement in the usual and only practicable mode; when by complying with the solemn contract into which she has entered, she would relieve the wants of a needy sister and family, for whom she professes great affection and concern; and be herself invested with the immediate enjoyment of one half of that, to which she was only entitled in remainder; and this too, without lessening her interest in her other moiety.

The last ground, upon which a reversal of the decree was demanded, was; that it was erroneous, inasmuch as it departed from the sense and terms of the agreement, in investing *Dugan*, the trustee, with the privilege of judging of the reasonableness of the rent: a privilege reserved to *Eliza Coale*, as one of the persons interested.

That this court have the power to grant adequate relief, in a case like the present, we have no doubt. Such relief can only be had, by providing the means necessary to carry into effect, the great leading object of the parties ; the leasing the property at reasonable rents : and in doing this, it is our duty to gratify the minor provisions of the agreement, as far as it can be done, consistently with the accomplishment of the grand design. To pass a decree, as is suggested, that leases should be made at such rents as *Eliza Coale* should sanction, would be doing a nugatory act. She has, by her conduct in this transaction, shewn a fixed determination that no leases shall be made, if she can prevent them : unless at a sacrifice, of the interests of her mother and sister, which she is not warranted in demanding. She has therefore forfeited this right, by acting, and shewing a determination to act, in such a way, as to render her exercise of it wholly inconsistent with that relief, to which the clear equities of the appellees entitle them. In transfering the power to another tribunal, the court know of none more safe, none so convenient, as the trustee by whom the leases are to be made and executed. So much of the Chancellor's decree therefore, as appoints *Cumberland Dugan*, trustee for the purpose of executing and performing the agreement, and gives costs to the appellees should be affirmed with costs : but the residue of said decree must be reversed, because the leases are not decreed to be made for ninety-nine years with liberty of renewal, as directed by said agreement: and upon a ground not involving the gist of the controversy between the parties, and therefore, perhaps, not noticed in the argument : but which obviously appearing on the face of the decree, cannot be disregarded by this court. One fourth part of the rents received by the trustee, are directed to be paid to the said *Eliza Coale*, her *executors*

and *administrators*; and in like manner, one other fourth after the death of the said *Hannah Kitty Chase.* The interest of *Eliza Coale*, in that portion of the rents, to her payable, under the deed from *John E. Howard* to *William Paca*, is real, not personal estate; and as such cannot be limited to her *executors* and *administrators* after the manner of personality. Such a limitation is contrary to the rules of law, and by it nothing passes but a life estate to *Eliza Coale:* her *executors* or *administrators* take nothing. *Vide* 6 *Ba. Abr. p.* 21, *tit. Rent. letter H.* Tis true, the decree of the Chancellor has literally pursued the agreement; but where an agreement contains provisions, which, by reason of some technical principle of law, cannot be carried into effect according to its literal import, it is the duty of a court of equity for the sake of the intent, to give it that construction which the rules of law will tolerate, and the intention of the parties to be collected from the whole instrument will justify. This will be effected, by ordering the rents to be paid to *Eliza Coale* and her *heirs* instead of *executors* and *administrators.* As authorities to shew that courts of equity to gratify the intent, construe agreements even contrary to the words, we would refer to 1 *Brid. Ind.* 430. *pl.* 6—7, and to 5 *Ves.* 399. 1 *P. Wms.* 234.

Although the appellees do not appear before us, seeking any revision or alteration of the decree; yet as it is to be new-modeled to secure the rights of the appellants: such a change should be made in it, as will do equal justice to both parties. Instead therefore of *Mary Barney's* moiety of the rents, after her death, being made payable to her children, their *executors* and *administrators*, as directed by the decree, it should be to her children and their *heirs.* And as the appellees have done nothing, which could authorize a court of Chancery to transfer to *Cumberland Dugan* the right, which by their agreement they have reserved to themselves, of deciding on the reasonableness of the rents reserved; the trustee should be enjoined to execute leases for such rents, as he, together with *William Barney* and *Mary* his wife, and *Hannah Kitty Chase* should think reasonable.

A decree, in conformity to these suggestions will be signed by the court.