MANNING v. AYERS.

(Circuit Court of Appeals, Seventh Circuit. January 4, 1897.)

No. 177.

1. CONTRACT TO IMPROVE AND SELL LANDS—PARTICIPATION IN PROFITS—CRITERION OF VALUE—EXECUTION SALE.

The firm of S., W. & Co., owning several tracts of unimproved land in Illinois, made a contract with one M., by which it was agreed that M. should go to reside on the lands, cultivate and improve them under the direction of S., W. & Co. (who would advance money for the purpose), and effect sales thereof, for which he should receive a sum equal to half the net income and half the net profits of the sales of the lands. It was

provided that, at the termination of the agreement, the lands and the property thereon should be sold, at auction or private sale, as agreed on by the parties, and the price realized should determine the profits. It was also expressly provided that M. was not constituted a partner, in any sense, with S., W. & Co. Afterwards, a supplemental agreement was made, providing, among other things, that S., W. & Co. should give M. an option to buy the property at cost, and that, if he did not avail himself of it, a price should be agreed on at which either party might buy or sell to the other, which, being accepted, would discharge all liability under the contracts. Before any of these provisions were acted on, S., W. & Co. failed, and made an assignment in New York, where they did business. Certain creditors attached the lands in Illinois, obtained judgments, and sold the lands under execution; one C., a creditor, buying them in, and also obtaining a conveyance of them from the assignee by the release of a part of his claim. In a suit brought by the assignee to determine conflicting claims to the lands, M. sought to establish an interest in the lands, and a right to purchase them from C., by virtue of the said agreements, of which he averred that C. had notice, and of which he sought specific performance. *Held* that, if there were any such right, the price paid by C. for the lands, at the execution sales, would not be a fair criterion of the value of the lands, or of the price at which M. should have the right to purchase under his contract.

2. SAME—SPECIFIC PERFORMANCE.

*Held*, further, that the contract was not one which could be specifically enforced, since no price was fixed by such contract for the land, nor any terms of payment adjusted, and none could be fixed by the court.

3. SAME—PERSONAL CONTRACT.

*Held*, further, that M. acquired no interest in the lands, by virtue of the contract, which a court of equity would recognize, but that the contract of S., W. & Co. to pay a compensation measured by the profit on the sale of the lands was merely personal.

4. SAME—ASCERTAINMENT OF PROFITS.

*Held*, further, that M. had no right to a decree for the sale of the lands, to ascertain the amount of the profits in which he would be entitled to share, both because the lands were always subject to sale by S., W. & Co., or at suit of their creditors, without remaining subject to any such right of M., and because the contract provided for ascertaining the profits by a sale, privately or at auction, as agreed by the parties, and not by a decree of the court.

Appeal from the Circuit Court of the United States for the Southern District of Illinois.

The original bill was filed by Marshall Ayers, assignee of Sawyer, Wallace & Co., and by his assignors, against Michael W. Manning, Charles Carroll, and others, to determine conflicting claims and interests in certain lands. The appellant, Manning, filed a cross bill, to which all parties to the suit were made respondents, asserting and seeking to enforce an interest in the lands by virtue of contracts with Sawyer, Wallace & Co., to whom the lands had belonged. The demurrers thereto of Carroll and of the complainants in the original bill were sustained, and the cross bill dismissed.

The essential facts are these: The firm of Sawyer, Wallace & Co., being the owner of the lands in question, on the 1st day of November, 1883, entered into the agreement with Manning as follows:

"Articles of agreement, made and concluded this the first day of November, A. D. 1883, between Sawyer, Wallace & Co., of the city of New York, party of the first part, and Michael W. Manning, of the city of Chicago, party of the second part, viz.: That the said party of the first part, being now the owners of certain lands in Williamson county, state of Illinois, popularly known as the 'John Pully Place,' containing about 300 acres; the 'Bob Pully Place,' containing about 240 acres; the 'Holland Place,' containing about 220 acres; the 'Joe Dillard Place,' containing about 330 acres; the 'Herrin Place,' containing about 80 acres; also several parcels, bought of the Illinois Central

Railroad Co., containing about 165 acres; also a parcel bought of the U. S. Gov., 40 acres; also a parcel lately bought by Thomas Miller of the Illinois Central Railroad Co., 500 acres,—and being desirous to improve the above-described lands, so as to obtain a greater price therefor than is obtainable in their present condition, the said party of the first part has:

"(1) Employed the said party of the second part to reside on said lands, give all his time thereto, take charge of, manage, and sell the same under the direction of the said party of the first part.

"(2) In compensation for the aforesaid services, to be rendered as above stated, the party of the first part agrees to pay to the party of the second part a sum of money equal to one-half of such net increase, in the aggregate value of said lands, as may be shown by the sale thereof, after deducting all taxes, insurances, assessments, and all other expenses incurred thereon, over and above their present aggregate value.

"(3) That the present value of said lands, for the purpose of this agreement, is hereby determined and agreed upon as follows, to wit:

|  | The John Pully place, | 300 | acres | at | $12.50 | per | acre | .... | $3,750.00 |
|---|---|---|---|---|---|---|---|---|---|
| " | Bob Pully " | 240 | " | " | 15.00 | " | " | .... | 3,600.00 |
| " | Holland " | 220 | " | " | 8.00 | " | " | .... | 1,760.00 |
| " | Joe Dillard " | 330 | " | " | 12.50 | " | " | .... | 4,125.00 |
| " | Herrin " | 80 | " | " | 12.50 | " | " | .... | 1,000.00 |
| " | Illinois Central R. R. parcel, | 165 | " | . |  |  |  |  |  |
| " | U. S. Gov. parcel, | 40 | " | " | 7.50 | " | " | .... | 1,537.50 |
| " | Thomas Miller place, | 500 | " | " | 3.00 | " | " | .... | 1,500.00 |

The present aggregate value being......................$17,272.50

"(4) In addition to the compensation hereinbefore stipulated (to wit, in clause 2), the party of the first part agrees to pay to the party of the second part a further sum of money equal to one-half the rents derived from the said lands, and one-half the net proceeds of the stock and produce bought, raised, and grown on said lands, as may appear by the sales thereof, after deducting the money expended in buying and keeping said stock, paying hand hire, purchase of implements, tools, seeds, etc., and all other expenses incurred by stock raising and farming on said lands. The amount so expended up to this time, and also to be deducted, is hereby agreed upon and fixed at the sum of $3,130.14, this being the amount expended by Thomas Miller through the party of the second part, for live stock, farming implements, etc., as shown by an accounting made between said parties on the 25th October, 1883, and now paid said Miller by party of the first part.

"(5) The said party of the first part further agrees to furnish such sums of money from time to time to improve said lands, buy stock, implements, tools, etc., as may hereafter be decided upon, and reference is hereby made to a certain memorandum, signed by the parties of this agreement, which described certain improvements and expenditures which it is now thought desirable to make.

"(6) The party of the first part also agrees to exchange, if it can be effected on satisfactory terms, the John Pully place for the Bill Chitty place (so-called) in Herrin's Prairie and sixty acres additional thereto; also, to buy the John Dillard place in Herrin's Prairie, containing 525 acres, if it can be had for $5,250.00, and by paying therefor the proceeds of the Holland place (the sale of which is hereby contemplated) and giving notes for the balance of the purchase money,—in which event the said places so purchased and acquired by exchange shall be substituted for the Holland and John Pully places in this agreement.

"(7) It is further agreed and understood, that any money furnished by the party of the first part, for any of the purposes of this agreement, in excess of $15,000.00, which sum includes the—

Present value of said lands, as hereinbefore fixed, at.......... $17,272.50

And the cost of stock, implements, tools, etc., already bought, and hereinbefore fixed, at..................................... 3,130.14

$20,402.64

"Shall bear interest at the rate of six per cent. per annum, compounded, and the amount of such interest shall be charged to and borne as part of the expense of carrying on the farming operations contemplated by this agreement, and shall be deducted from the profits thereof, to determine the net amount of the same, in like manner as other expenses, as hereinbefore provided.

"(8) The party of the second part, in consideration of the compensation hereinbefore stipulated, agrees and binds himself to give his direct personal services and all his time to the management and care of the aforesaid lands, and to the farming of the same, to the extent of his ability and the means at his command, and to reside on the Joe Dillard farm with his family; also, to furnish to the party of the first part strictly accurate statements and vouchers for all expenditures, promptly, as made; to keep a strict and accurate account of all produce, stock, or other property sold; and to report the same and remit the proceeds thereof, promptly, to the said party of the first part, so that they shall be always thoroughly well informed of all transactions made by the said party of the second part, and of the true condition of the interests intrusted to his care. The said party of the second part especially agrees to use his best efforts to effect sales of said lands under the direction of the said party of the first part, as soon as the improved condition of the same will warrant such action.

"(9) This agreement is to continue in force for the term of three years from the first day of January, 1884, unless terminated sooner by the consent of the parties thereto, and at the end of the said term of three years, all the said lands, stock, produce, implements, tools, etc., which may have been acquired under this agreement, and not before disposed of, shall be sold at auction or private sale, as may be agreed upon by the parties thereto, and in this manner shall be determined the net increase in the value of the said lands, the net profits of stock raising and farming, and the amount of compensation due to the party of the second part under this agreement.

"(10) It is further agreed that, in the event of the death of the said party of the second part, the party of the first part shall have the right thereupon to terminate this agreement, sell all the property of every kind, and determine the amount due to the estate of the said party of the second part, in the manner provided hereinbefore, viz. in clause 8, or to continue the same under such management as they may deem best, until the full expiration of the said term of three years.

"(11) It is expressly agreed and understood that the party of the second part is not, nor is meant to be, constituted a partner, in any sense, with the party of the first part under this agreement.

"(12) The party of the second part has the right, under this agreement, to use free of charge, such wheat, corn, fresh meat, and pork grown on said lands, to the extent required for actual diet consumption by his own family, but shall keep and render an account of the same to the party of the first part. He shall also have the right to grow and use, without charge, such garden vegetables as may be required for his own family use.

"Sawyer, Wallace & Co.<br>"Michael W. Manning."

The memorandum referred to is omitted, being immaterial.

Upon the making of the agreement, Manning, with his family, went upon the lands, and in compliance with that agreement, and a supplemental agreement executed April 21, 1888, he managed, cultivated, improved, and developed the lands, until deprived of possession by the receiver appointed in this cause, having "devoted more than seven years of his time, and of the time of several members of his family, to the management, improvement, and development of said lands," whereby, it is alleged, they have become greatly enhanced in value. The supplemental agreement is of the following tenor:

"Memorandum of agreement to be formally entered into and executed by and between the undersigned concerning the future management and disposition of their joint interest in lands in Williamson county, Illinois, to wit: S., W. & Co. to have all the income from the crops, and pay the necessary expenses for producing same, and pay, also, to Manning, at the rate of $1,000 per annum beginning May 1st next, and ending December 31st, next, in con-

sideration of which Manning to give his time and efforts to sell the property, meanwhile maintaining the property in as good condition as the revenue therefrom will admit. No expenditure exceeding revenue to be made without the consent of both parties in writing. Manning to make no charge for selling the property, but necessary expenses actually incurred (as may be agreed upon from time to time) to be advanced by S., W. & Co. but charged to the property, as provided in contract now existing, and to which reference is now made, and to be deducted before any profits are declared. S., W. & Co. to advance such sums as may be required for the necessary expenses of carrying on the farm work until crops grown and sold. S., W. & Co. to furnish the exact cost of the property up to May 1st next (as provided in contract referred to), and to give Manning the option of buying it at such cost with interest until Dec'r 31st next. Should Manning not avail himself of the said option, a price is to be agreed upon at which either party may offer to buy or sell the other, which, being accepted, discharges all obligations under the contract referred to. Should Manning elect to take the property at cost, then, and in that case only, interest shall continue to run against his interest therein. Privilege as to garden produce for family use is same as in existing contracts. The terms of payment for the property in case Manning should elect to buy it, to be considered and settled subsequently.

"Sawyer, Wallace & Co.
"M. W. Manning.

"New York, April 21, 1888."

The firm of Sawyer, Wallace & Co. and its individual members became insolvent, and on September 4, 1890, executed to Marshall Ayers a deed of assignment, in conformity with the laws of New York, where the business of the partnership had been conducted, of all partnership and individual property held by them for the payment of all debts without preferences. Thereafter, with full knowledge of the assignment, certain creditors of the firm sued out of the local courts writs of attachment, and, having obtained judgments, caused the lands, excepting 560 acres in Franklin county, to be sold; Charles Carroll becoming the purchaser of those in Williamson county at the price of $13,000, of which he paid to other attaching creditors about $1,200, and credited the remainder upon his own judgment; and of the 330 acres in Franklin county, sold for $550, he is the holder and owner of the certificate of sale. He also claims a lien upon the unsold lands in Franklin county by virtue of the unsatisfied judgment which he recovered in his attachment suit in Williamson county. The cross bill further charges "that said assignment, so made by said firm of Sawyer, Wallace & Co., was administered by and under the direction of the judicial court of the city and county of New York, in the state of New York, known as the 'Court of Common Pleas,' which court, by the laws of the state of New York, had and has full power and jurisdiction over said assignment, and over the disposition of the property of said insolvent firm and the individual members thereof; that, in the year 1891, and since the filing of said original bill in this cause, said Charles Carroll caused said Ayers, as assignee of said insolvent firm, to file a petition in said court of common pleas, praying that court for leave to sell and convey to said Charles Carroll all of said lands, so subject to said agreement and supplemental agreement, located in said counties of Williamson and Franklin, in consideration of said Carroll deducting from his claim against said insolvent firm of Sawyer, Wallace & Co. (which claim, amounting to over one hundred and seventy-five thousand dollars, said Carroll had before the filing of said petition proven and had allowed against the estate of said insolvent firm in the hands of said assignee) the sum of twenty thousand dollars, and relinquishing any claim to a dividend out of the estate of said insolvent firm upon the last-mentioned sum of money; that said petition, so filed by said assignee at the instigation and request of said Carroll, stated that all of said lands were not worth twenty thousand dollars, and was supported by an affidavit, filed with said petition in said court of common pleas, of one George W. Smith, the solicitor for said assignee in this cause, to the effect that said lands so subject to said agreement and supplemental agreement were not worth to exceed the sum of $17,-000 or $18,000, which affidavit said Carroll procured and caused to be filed

with said petition; that said petition and affidavit were, in the month of October, 1891, by the procurement of said Carroll, presented to said court of common pleas; and, acting thereupon, that court, in the month last mentioned, granted the prayer of said petition, and ordered said assignee to convey to said Carroll all of said lands so subject to said agreement and supplemental agreement, upon said Carroll deducting from his said claim so proven in said insolvent proceedings the sum of twenty thousand dollars, and relinquishing all right to any dividend from said insolvent estate upon the sum of money last mentioned; and thereupon, in the month of October or November, 1891, said assignee made and delivered to said Carroll a deed purporting to convey to said Carroll all the interest and estate of said firm of Sawyer, Wallace & Co., and of the individual members thereof, in and to all of the lands last mentioned, and said Carroll still has the interest therein so conveyed to him. Your orator further showeth that the assets of said insolvent firm and the members thereof at no time have been sufficient to pay more than ten cents upon the dollar of the indebtedness of said firm and the members thereof, and that the claim of twenty thousand dollars so withdrawn by said Carroll from his claim against said insolvents was not worth over the sum of two thousand dollars; that your orator was not a party to said petition so filed by said assignee, and had no notice thereof, and was not a party to, nor notified of, said proceeding in said court of common pleas, which resulted in said deed so made to said Carroll; that all of said judgment creditors, including said Carroll, had notice of the rights and interests of your orator in said lands, and of said agreement and supplemental agreement, at and before the times of suing out each and every one of said attachment writs, and at all times since, and said Carroll had such notice long prior to and at the time of the making of said conveyances to him by said assignee, and said Carroll, at the time of suing out said attachments and each of them, and at all times since, and at the time of the delivery of said deed to him by said assignee, knew that your orator had the right and preference of right to purchase all of said lands at a price to be fixed by said firm of Sawyer, Wallace & Co., or by any authority or tribunal which has acquired the power of disposing of said lands in the stead of said firm of Sawyer, Wallace & Co. And your orator avers that the said assignee acquired no greater right or power respecting said lands than was possessed by said insolvent firm at the time of making said assignment, and took said lands subject to the right of your orator to purchase the same in preference to anybody else, all of which was well known to said Carroll long before and at the time of the filing of said petition, and the making of said deed to him, and also at the time of the suing out of each one of said attachment writs, and at all times since: that by said proceedings in said court of common pleas the selling price of said lands was fixed and determined by the court last mentioned, and by an authority having power to bind said insolvent firm and said members thereof, and also said assignee and said Carroll, and said Carroll took and acquired the title to said lands by said deed from said assignee, with notice of the rights of your orator, and as the trustee of and for your orator, and now holds the same as trustee for your orator, and ought to be compelled to convey the same to your orator upon the payment by your orator to said Carroll of whatever amount or value said Carroll paid therefor or allowed therefor to said assignee, which payment your orator hereby offers to make to said Carroll; and said Carroll, having acquired the title to said lands as the trustee of your orator, cannot make a profit out of his trust, and is, in equity, bound to convey the same to your orator, upon being reimbursed for the actual amount of the consideration paid by him for said lands; and, if said consideration includes the amount paid by him therefor at said attachment sale, your orator also offers to repay the same to him, upon receiving from said Carroll a conveyance of said lands. And your orator avers that neither said Sawyer, Wallace & Co. nor your orator took any steps to carry out the provision of said supplemental agreement for the sale or purchase of said lands, up to the time of making said assignment, for the reason that the members of the firm last mentioned and your orator agreed and were of the opinion, during all the time prior to said assignment, that the conditions were not such as to make a present sale advisable, and by the consent of all parties concerned the time for making a sale of said lands by either party to the other was post-

poned until said assignment was made. Your orator shows that he is able and willing, and hereby offers, to pay to said Carroll the value of all the consideration paid by him to said assignee for said lands with interest thereon, and all moneys paid by him therefor at said attachment sale or sales, with interest thereon, or any other sum which this court may, on a hearing hereof, decree as the proper and just compensation to be paid therefor. Your orator further shows that, in any event, he is entitled to have an accounting in this court of all transactions had between your orator and said insolvent firm under said agreement and supplemental agreement, and, in case said sale by said assignee to said Carroll cannot be held to have fixed the selling value of said lands, to have the same sold under the decree of this court, in order to bring about a full adjustment of said transactions; and your orator avers that said complainants in said original bill have abandoned their prayer for an accounting therein contained."

Samuel P. Wheeler, for appellant.

Carl Roedel, for appellee.

Before WOODS, JENKINS, and SHOWALTER, Circuit Judges.

JENKINS, Circuit Judge (after stating the facts). It is insisted for the appellant that, under the supplemental agreement, he has the right to purchase the lands, and to demand a conveyance of them from Carroll for the consideration paid by him, or, if that may not be allowed, then for a reasonable price to be determined by the court. It is clear that the appellant would not have right, in any event, to obtain the lands for a consideration to be measured by the amount which they cost Carroll. He procured such title through sales of the land upon executions, and afterwards by composition with the assignee of Sawyer, Wallace & Co. The cost price, under such circumstances, might be an unfair criterion by which to gauge the value of the lands in accordance with the contract. If it be conceded that the appellant may properly demand that a court of equity should specifically enforce the agreement for an option, it must be upon the very terms of the option, and not upon other and different terms under which they were obtained by Carroll. It cannot be supposed that, when the lands were free and unincumbered, the owner, being solvent, would consent to terms which he would be willing to take, and would perhaps be glad to obtain, when insolvency had occurred, and the lands were incumbered by judgments and sales under executions. The contention in this behalf we regard as wholly untenable.

Nor is the contract one which can be specifically enforced in equity. The agreement was that if Manning should not avail himself of the option expiring December 31, 1888, then "a price is to be agreed upon at which either party may offer to buy or sell the other, which, being accepted, discharges all obligations under the contract referred to. * * * The payment for the property, in case Manning should elect to buy it, to be considered and settled subsequently." There is here no obligation upon either party to accept the offer of the other. There is no price determined, nor are any terms of payment adjusted. Manning was at liberty to refuse to buy at the price which might be agreed upon, and, if he should elect to buy at that price, the agreement would still be inoperative, unless the minds of the parties should meet upon the terms of pay-

ment. The agreement for sale would appear to have been merely an optional mode of discharging the obligations and settling the rights of the parties under the original contract. It never became effective, by offer or by acceptance. The agreement is wanting in obligation upon the part of both,—is obscure, indefinite, and uncertain. It is not within the province of the courts to make contracts for parties, nor will equity compel a specific performance of a contract when any material part of it remains to be settled by negotiation. A court of equity does not sit to determine the price or the terms of payment upon which land should be sold by one to another, or to compel specific performance of an optional agreement to buy or sell where nothing has been done in pursuance of the agreement. Nor can a court impose upon a contract terms, not therein agreed to, different from the contract both in form and in substance. Milnes v. Gery, 14 Ves. 400, 407; Bromley v. Jefferies, 2 Vern. 415; Potts v. Whitehead, 20 N. J. Eq. 55; Norfleet v. Southall, 3 Murph. 189; Huff v. Shepard, 58 Mo. 242; Graham v. Call, 5 Munf. 396; Hayes v. O'Brien, 149 Ill. 403, 414, 37 N. E. 73; Winter v. Trainor, 151 Ill. 191, 194, 37 N. E. 869.

In Bromley v. Jefferies, one covenanted that another should have his land for a certain sum less than any other would give for it. The court refused to decree a specific execution of this agreement, by reason of its uncertainty.

In Milnes v. Gery, the court refused specific performance of an agreement to sell upon a valuation of arbitrators to be chosen by the parties in the manner specified. Arbitrators were appointed by the parties, but they were unable to agree. The master of the rolls, Sir William Grant, delivering the opinion of the court, observed:

"The more I have considered this case, the more I am satisfied that, independently of all other objections, there is no such agreement between the parties as can be carried to execution. The only agreement into which the defendant entered was to purchase at a price to be ascertained in a specific mode. No price having ever been fixed in that mode, the parties have not agreed upon any price. Where, then, is the complete and concluded contract which this court is called upon to execute? The price is of the essence of a contract of sale. In this instance, the parties have agreed upon a particular mode of ascertaining the price. The agreement that the price shall be fixed in one specific manner certainly does not afford an inference that it is wholly indifferent in what manner it is to be fixed. The court, declaring that the one shall take and the other give a price fixed in any other manner, does not execute any agreement of theirs, but makes an agreement for them, upon a notion that it may be as advantageous as that which they made for themselves. How can a man be forced to transfer to a stranger that confidence which, upon a subject materially interesting to him, he has reposed in an individual of his own selection? * * * I do not know that upon this point there can be any difference between decisions at law and in equity. If you go into a court of law for damages, you must be able to state some valid legal contract, which the other party wrongfully refuses to perform. If you come to a court of equity for a specific performance, you must also be able to state some contract, legal or equitable, concluded between the parties, which the one refuses to execute. In this case the plaintiff seeks to compel the defendant to take this estate at such price as the master of this court shall find it to be worth. Admitting that the defendant never made that agreement (and my opinion is that the agreement he has made is not substantially, or in any fair

sense, tlie same with that), and it could only be by an arbitrary discretion that the court could substitute the one in the place of the other."

In Graham v. Call, the contract was for the sale of land, and provided that the price should be thereafter agreed upon, which never was done, in consequence of the death of one of the parties. The court refused specific performance of the agreement, upon the ground that it was not completed and perfected, so that it could be carried into execution.

In Norfleet v. Southall, one of the two joint owners agreed to convey to the other upon payment of the sum which the mills cost him, to be determined by four persons named, which was attempted to be done, but the arbitrators were unable to agree. The court, upon a bill which asked that an account of the cost of the mill might be taken, and that there might be specific performance of the agreement to convey upon payment of the amount so ascertained, refused such specific performance, as wholly without the province of a court of equity, asserting that so to do would be the exercise of an arbitrary discretion, which a court of equity wholly rejects.

In Potts v. Whitehead, by the contract there in question, the offer was to convey the land within the time fixed at a price named, of which a stated portion was to be paid upon execution of the deed, and the balance in a mortgage upon the land with interest. It was held that the failure to designate the time of the payment of the amount to be secured by mortgage left a material part of the contract to be settled by negotiation, and therefore the contract could not be specifically enforced.

In Huff v. Shepard, an agreement for the sale of lands contained a stipulation that the purchase money was to be paid upon such terms as may be agreed upon between the parties. The court refused specific performance, asserting that, in the proposition to compel a person to agree, "the element of compulsion would annihilate in advance the thing it promised to create; for no contract can live in the law's atmosphere, unless born of voluntary choice in the parties."

The doctrine of these cases is recognized in Gunton v. Carroll, 101 U. S. 426, 430, where, after statement of the rule, it is said: "It cannot be successfully disputed that, in the general terms thus stated, this is the established equity doctrine." That case was taken out of the general rule by the reason that the consideration had there been already paid, while the doctrine, as the court states, rests upon the ground "that the court must be enabled to enforce the payment of the price simultaneously with compelling the conveyance, and it cannot do this by enforcing an arbitration." There is manifest distinction between that case and the one at bar.

It is clear, therefore, that the agreement in question is so uncertain as to price and terms that we cannot decree a specific performance of it. It would be an anomaly in the history of jurisprudence for courts of equity to fix the value of land in enforcement of a contract of sale which fails to determine the price, and to compel the parties to abide by the price which the court should decree.

It is also urged that under the original agreement Manning ac-

quired an interest in the land in question which a court of equity would recognize. Upon mature consideration we are satisfied that the suggestion cannot be entertained. By that contract the appellant was engaged to reside upon the lands, and to effect sales of them under the direction of the owners, Sawyer, Wallace & Co. In compensation for his services, the owners agreed to pay him a sum of money equal to one-half of the net increase in the aggregate value of the land as would be shown by a sale of them over and above their then aggregate value expressed in the agreement. Manning was also to be paid a further sum, equal to one-half of the rentals derived from the land and one-half of the net proceeds of the stock and produce grown upon the lands, the owners furnishing all needful funds to operate and improve the land. Manning had, also, a right to the use of the produce of the farm necessary for the support of his family. The agreement was to continue until January 1, 1887, at which time all the lands, stock, produce, and farm implements should be sold, at auction or private sale, as might be agreed, in order to ascertain the net increase of the value of the land, the net profits of stock-raising and farming, and the amount of compensation due to Manning under the agreement. It must be conceded that scrupulous care was employed in the drafting of this agreement to exclude Manning from any interest, legal or equitable, in the lands. The ownership and the right of sale of the lands remained in Sawyer, Wallace & Co. They conferred no title upon Manning, and he acquired none under any term of the contract. The statement in the agreement of the then value of the lands, and the provision for the sale of such as remained unsold at the termination of the agreement, merely indicated a method of determining the amount of compensation to which Manning was entitled. The covenant of Sawyer, Wallace & Co. was personal to pay such sum thus ascertained for Manning's services. Such agreements do not confer an interest in lands. Le Moyne v. Quimby, 70 Ill. 399.

It is further urged that, failing in his other contentions, the appellant is entitled to an accounting, under the direction of the court, of the transactions between himself and Sawyer, Wallace & Co., under the agreements, and to a decree that the lands should now be sold for the purpose of ascertaining the appellant's share of the net profits to be derived from the lands; and Smith v. Gear, 59 Ill. 381, is urged to our consideration in support of this contention. There one party furnished the funds to purchase, and the other bought, certain notes and a mortgage, which, it was understood, should be foreclosed, and the land bid in by the one furnishing the funds, and then sold, and one-half of the net profits should be paid to each. It was urged that no sale should be ordered because it had not been shown that a profit would result from one. The court overruled this objection, and ordered a sale. That case is essentially different from the one in hand. There each party was entitled to a moiety of the profits in the land as such. Here the agreement was that the sale should be public or private, as the parties might agree, and for the purpose, merely, of determining the amount of compensation which, under the agreement, Sawyer, Wallace & Co. were personally

obligated to pay to Manning. This agreement was made in 1883, and was to continue in force until January 1, 1887. In April, 1888, the supplemental agreement was made, by which an option was given to Manning to purchase the lands at cost. Whether that supplemental agreement may be considered in extinguishment of the original agreement to sell, or whether a failure to carry out the supplemental agreement would operate to restore in full force all the terms of the original agreement, we need not stop to consider. We are of opinion that there are equitable considerations which should avail in a court of equity to work a refusal to exercise any discretionary powers lodged in the court to grant the relief asked, if such relief could properly be decreed under any circumstances. There was nothing in the original agreement which prevented Sawyer, Wallace & Co. from selling the land at any time. To the contrary, it was the manifest intent of the agreement that the land should be sold. Such an agreement could not avail to prevent creditors from acquiring title to the land through legal proceedings, or to prevent Sawyer, Wallace & Co. or their assignee, from disposition of the land. It would be strange, indeed, if, under an agreement which gave no interest in the lands, the sale of them could be effectually prevented, unless the purchaser took them subject to the liability of their sale under order of the court for the mere purpose of ascertaining the amount of compensation to be paid under a personal covenant in the agreement. That would work a most inequitable result.

The contention of the appellant is also subject to the objections hereinbefore considered. Assuming that a court of equity could enforce such an agreement, it is to be observed that the contract of the parties was that the undisposed-of lands should be sold at auction or private sale, as may be agreed upon by the parties. It was contemplated that the parties should determine by agreement which of the two methods of sale was to be preferred. In the absence of any agreement of the parties upon that question, and the absence of any attempt upon the part of either for its performance by the other, can the court now determine the question for them, and say that a private sale is to be preferred to a public sale, or vice versa, and so impose upon the parties a term in a personal contract for payment for services to which they have not agreed? We do not consider that we have a right to do so, or, having the right, that it would be equitable, under the circumstances of this case, to exercise the power, having the discretion to decline it. The decree will be affirmed.