## GUNTON *v.* CARROLL.

A. and B. in November, 1846, entered into an agreement under seal, providing for the settlement of long standing and disputed accounts. A balance from B. to A. was ascertained and the mode of payment and security agreed upon. A. released property of B. from the lien of judgments. B. among other things stipulated that he would obtain partition of certain lands wherein he had an undivided interest, and convey in fee the part assigned to him in severalty to A. at such price as should be adjudged by three appraisers, one to be appointed by A., one by B. and one by the other two. Such price to be credited on the judgments held by A. against B. and that the latter would give good security for the balance remaining due. B. died in 1849. There was no partition until 1866, when it was effected by his devisees, a fact not known to A. until 1872. They have made to A. no conveyance of the part of said lands assigned to them in severalty. A. filed his bill in 1876, alleging that he had performed all the stipulations on his part to be performed, and that $40,000 of the original debt with accruing interest remains unpaid, and praying for such a conveyance, for the ascertainment of the balance under the order of the court and for general relief. The devisees demurred. *Held*, 1. That upon the case made by the bill, A's remedy was not barred by the lapse of time. 2. That A. having under the agreement parted with rights, and B. received value, the consideration of which was in part the stipulation concerning the lands, the agreement for the conveyance can be specifically enforced and the court will, if it be necessary, provide a mode for ascertaining the value of the lands.

APPEAL from the Supreme Court of the District of Columbia. The facts are stated in the opinion of the court.

*Mr. John D. McPherson* for the appellants.
*Mr. George F. Appleby* for the appellees.

MR. JUSTICE MILLER delivered the opinion of the court.

The appellants in their character of trustees of the Bank of Washington brought this suit against the executors and devisees of Daniel Carroll. The charter of that bank expired a great many years ago, and the trustees who conduct its affairs are acting under a statute of Congress. At the time of the expiration of the charter there was a large indebtedness on his part to the institution, a portion of which was secured.

There were several judgments against him in favor of the bank, and he had a suit in chancery for the adjustment of disputed matters in regard to that indebtedness.

On the 3d day of November, 1846, an agreement under seal was entered into between him and the trustees by which all their disputes were settled. The sum due by him to the bank was ascertained, and the mode of payment and security agreed upon.

This agreement is the foundation of the present suit. Among other things completed at the time was the payment of part of his debt, the release of certain real estate from the lien of the complainants' judgments, and his transfer of judgments held by him against other persons to the trustees, with an understanding that all moneys thereafter collected on them should be credited on the judgment of the bank against him. Certain property known as the Sligo estate, in which he had an undivided interest, was by him to be conveyed to the bank as soon as he could procure a partition with the other part-owners. He also covenanted that, after all this was done, he would give good security for any balance due by him to the bank. As the agreement with regard to the Sligo property is the matter of principal importance in this suit we give that part of it *verbatim*: " The said Daniel Carroll shall forthwith cause, at his expense, the property known as the Sligo estate, of which he is the owner of an undivided share, to be legally or equitably divided between him and the other owner or owners thereof, and

shall immediately thereafter, by a valid deed, convey the share or portion of said property which may be allotted to him unto the trustees of the said bank, or as they may direct, in fee simple, at such price as three competent freeholders — to be selected, one by the said Daniel Carroll, another by the trustees of said bank, and the third by the other two appraisers — shall estimate and adjudge the same to be worth, as if sold on a credit of three equal payments at one, two, and three years, with interest thereon payable semi-annually ; and the price, on the due execution of said conveyance to the trustees of said bank, or as they may direct, shall be credited against the said judgments, so as aforesaid held by the bank against said Daniel Carroll."

Much of the agreement was performed on both sides. Money was paid and property released. The bill avers that all which the trustees agreed to do, or could do, was done, and that there is, including interest, over $40,000 of the original debt unpaid, and that no security has been given. In reference to the Sligo property it is alleged that no partition was made by Carroll in his lifetime — he died in May, 1849 — but that his devisees effected such partition in 1866, and have since sold some part of the property allotted to them in that partition and received the purchase-money. It also alleges that the trustees were not aware that any such partition had been made until 1872, this suit having been commenced in 1876. They also set up an attempt, in 1875, to bring these matters before the court in the original chancery suit, pending when the agreement was made, by an amended bill and revivor, which was overruled.

The defendants filed a general demurrer, setting up twenty grounds of demurrer. It was sustained by the court below and the bill dismissed.

The demurrer must be overruled, if there be any part of the bill which entitles the complainants to relief.

The main ground of the demurrer — the lapse of time since the cause of action accrued — is relied on in reference both to the Statute of Limitations and the general doctrine of laches. If the judgments against Carroll have never been revived by *scire facias* or otherwise, the debt which they represented is

barred by limitation, and its collection cannot be enforced by any proceeding at law. The bill is silent on that subject. It may admit of doubt whether in the mere absence of any such allegation the court will raise the presumption of payment on which the equitable defence is founded. Without deciding this, we think there is another ground on which defendants must be put to their answer, and in that answer they can plead or rely on the statute, or the lapse of time coupled with an averment that the judgments are no longer alive.

That matter concerns the Sligo property. No bill for specific performance could have been brought against Carroll or his devisees before the partition required by the agreement was made. The delay in making it was that of Carroll and of his devisees. For this the complainants were in no manner chargeable with laches and should receive no detriment. Frye on Specific Performance, sect. 740; *Ridgway* v. *Wharton*, 6 H. of L. Cas. 237.

The partition was made in 1866, and the knowledge of it did not come to the complainants until 1872. If they had known it as soon as it occurred, six years, under all the circumstances, would not be considered as an unreasonable delay on their part, in view of the fact that the defendants had taken twenty years to perform one part of the contract, namely, to make partition.

In 1872, as soon as they learned that the partition had been made, the trustees attempted to assert their rights by an effort to revive the old chancery proceeding out of which the agreement arose. Being defeated in this, they commenced the present suit in March, 1876. We think that on the face of the bill they are not barred by lapse of time. If there are other matters not shown in the bill which would make that a bar, no injury can accrue by requiring them to be shown by way of answer or plea.

It is said, however, in regard to the Sligo property, that the original contract is one of which a court of equity cannot enforce specific performance, because the price to be paid for it is not definitely fixed, and a court of equity cannot enforce the agreement to submit the question of price to the award of arbitrators.

It cannot be successfully disputed that in the general terms thus stated this is the established equity doctrine. It would be applicable if this was a case in which the complainants had agreed to buy and the defendants to sell, the conveyance of the property; and the actual payment of the price resting in covenants yet to be performed, the latter being the sole consideration of the former.

It is, however, quite otherwise in the matter before us. This particular clause was only one of many which adjusted longstanding and complicated transactions and compromised a vexatious litigation. Moneys were paid, liens released, sureties discharged, and suits settled by this agreement. Under it the complainants parted with rights and Carroll received value, the consideration of which was, at least in part, this stipulation about the Sligo estate.

The contract differs in another particular from the cases cited to show that it cannot be enforced. The doctrine there rests upon the ground that the court must be enabled to enforce the payment of the price simultaneously with compelling the conveyance, and it cannot do this by enforcing an arbitration. But in the case before us the price was already paid. The money was in Carroll's hands. The only thing to be done was to determine how much of his debt to the bank was to be satisfied by the conveyance. The case is, therefore, one in which the land was sold to the bank and the purchase-money left in the hands of the vendor. By the terms of the agreement, Carroll was to convey immediately after partition, and then the price was to be ascertained. If he had conveyed, as it was his duty to do, or if his heirs had conveyed as soon as they had made partition, the conveyance would not be rescinded because they could not agree upon the price or upon arbitrators. With the title in the complainants and the money in possession of defendants, a court would find a way to ascertain the credit to be allowed on Carroll's debt to the bank.

Another view is the probability that Carroll's debt as to every thing else is barred, and that the debt is three or four times the value of this property. So that its valuation is a mere form, immaterial to either party.

In view of a court of equity, a contract for the sale of land is

treated, says Mr. Justice Story, for most purposes, precisely as if it had been specifically performed. The vendee is treated as the owner of the land and the vendor as the owner of the money. The vendor is deemed in equity to stand seised of the land for the benefit of the purchaser, and the trust attaches to the land so as to bind the heir of the vendor. 1 Story Eq. Jur. sect. 790, and the cases there cited. Of course the Equity here stated is stronger when the purchase-money is actually in the hands of the vendor.

Nor is the principle inflexible that the court will not specifically enforce the contract where the price is not fixed or is left to be fixed by arbitration.

*Cheslyn* v. *Dalby* (2 Y. & C. 170) is very much like the present case. Cheslyn being indebted to Thomas Dalby in a large unliquidated sum, gave a deed of trust for money borrowed at the time from another party, with a stipulation that it should also stand as a security for the unliquidated debt of Dalby to be afterwards ascertained by arbitration. Cheslyn having paid the principal sum secured by that deed, brought suit for a reconveyance, and Dalby filed a cross-bill to have his debt paid out of the property before this was done. The objection was raised that this was in the nature of a specific execution of the deed, which the court would not decree, as the amount was uncertain, and could not be ascertained in the stipulated mode, as no award had been made and the umpire was dead. But the objection was overruled.

Alderson, B., says: " This agreement is composed of two distinct parts: 1. It is admitted there is some balance due to Thomas Dalby, and it is agreed that the estate is to be subject to a lien for that balance. But, 2dly, there is also an agreement as to a specific mode of ascertaining that balance in case of dispute. Now, the latter has failed by events over which the parties had no control. But it seems to me that, notwithstanding this, the former part remains entire, and if Mr. Cheslyn has admitted that there is a balance due, and has by a deed, executed under such circumstances as that it ought to be enforced, agreed that his estate should be subject to a lien for that balance, why am I to decree a reconveyance of the estate without compelling him to fulfil that part of the agreement? "

It was accordingly referred to a master to state an account in which this unascertained balance of Dalby's debt should be included.

In the present case, Carroll made his agreement, in which a balance ascertained was admitted to be due; the land was to stand in part payment of this balance. He died before arbitrators could be appointed to fix the sum at which the estate should be taken. The demurrer admits all this.

*Dinham* v. *Bradford* (Law Rep. 5 Ch. 519) is another case in which where one partner was in a certain event to take the partnership assets at a valuation to be ascertained precisely as in the case before us, Lord Hatherley said: "Here is a man who has had the whole benefit of the partnership in respect of which this agreement was made, and now he refuses to have the rest of the agreement performed on account of the difficulty which has arisen. . . . If the valuation cannot be made *modo et formâ* the court will substitute itself for the arbitrators."

So of the case before us. Carroll has all the benefit of the agreement, in releasing property from liens, in paying his debt by his claims on others, and in a long indulgence, and now, because he has died without appointing arbitrators, his heirs say this part of the agreement must fail.

We think on the whole the demurrer should be overruled, and defendants put to their answer, and for this purpose the decree of the court below will be reversed, and the case remanded to it for further proceedings, and it is

*So ordered.*