LOUIS K. LIGGETT COMPANY *v.* HENRY ROSE
ET AL.

*Contract for Lease—Specific Performance—Notice to Subsequent Lessee—Knowledge of Agent—Real Estate Broker —Guarantors of Lease—Right to Reject— Terms of Decree.*

An agreement upon condition, which was not enforceable at its inception and for some time thereafter, because the performance of the condition had not been fulfilled by the obligee, may be specifically enforced by the latter, if he has acted in good faith, and if at any time previous to the decree he is able to complete the performance of the condition, provided time is not of the essence of the contract, and the delay in fulfilling the condition has not been intentional, unreasonably long, or prejudicial to the other party.　　　　　　　pp. 155-158

Although time was of the essence of a contract to make a lease, yet the right of the proposed lessor to refuse to perform the contract, by reason of the failure of the proposed lessees to tender an executed lease with guarantors and a money deposit, as required by the contract, was not an absolute right, but could be lost by his conduct, as where he notified the proposed lessees that he would not perform the contract.　　　　　　　p. 158

A contract which provided for the execution of "a proper lease," was not lacking in certainty, where the context stated the terms, the quoted words evidently meaning merely that the lease should set forth these terms in an adequate manner by an instrument of writing in legal form.　　　　　　　p. 159

A contract for the making of a lease, which definitely sets forth the necessary elements of a valid lease, is enforceable though it does not contain all the averments of similar demises.　　　　　　　p. 159

A lease made upon a valuable consideration to one who is without actual or constructive notice of a prior contract by the lessor to make a lease to another prevails over such prior contract.　　　　　　　p. 159

The doctrine that possession of the land is notice of the rights of the party in possession to the extent that they would have been ascertained upon inquiry is limited to rights asserted under subsisting relations between the party in possession and the owner of the land, and so to some actual outstanding title, or equitable interest, and should not be extended to those which might arise from a non-existent, different, and merely anticipated status with a third party. p. 160

A lessee was not charged with knowledge of a prior contract by the lessor to lease to another, merely because of the possession of the premises, under an existing short term lease, by one who knew of the prior contract and expected to obtain a sub-lease from the beneficiary thereof. p. 160

The declarations of an alleged agent are not sufficient to establish his agency. p. 161

That a clerk in the real estate department of a large chain store company was told by plaintiff that he held a contract for a lease on certain property was not sufficient to charge the company with notice of the contract, the property having been previously considered and rejected by the company as not suitable for its purposes, as the clerk stated, and he not reporting plaintiff's statement to his superior officer. p. 161

Although a real estate broker employed by a company in the procurement of a lease to it also represented the intending lessor, by whom the broker's commissions were to be paid, as the intending lessee knew, notice to the broker in regard to the subject-matter of the employment was notice to the intending lessee, in spite of the broker's failure to communicate his knowledge to the latter. pp. 162-167

An intending lessee of property, who knew of a prior contract for the lease of the property to another, and who, when told by the owner that such other's rights under the contract had been forfeited or abandoned, failed to make inquiry of such other as to the truth of this statement, was charged with notice of the existence of such rights, the circumstances being such as would prompt the owner to misrepresent or deny the rights under the contract. p. 166

One who acquired a lease of property with notice of a prior contract by the owner to lease to another was subject to the same

equity as the owner, stood in the same place, and was bound to do what the owner would be bound to do by a decree for specific performance.                                          p. 167

The discretion of the chancellor as regards specific performance is not an arbitrary, capricious, or favorable discretion, but a sound judicial discretion, which will be exercised only in accordance with established principles of equity when considered in connection with all the circumstances of the particular case.

p. 167

If a contract to sell or lease real estate is in writing, and is complete, certain, and fair and equal in all respects, for an adequate consideration, and capable of being performed, it is as much a matter of course for a court of equity to decree specific performance, as it is for a court of law to give damages for its breach.                                        pp. 167, 168

The rule that specific performance of a contract will not be enforced, if the resulting injury to the defendant would be far greater than the benefit which the plaintiff might derive therefrom, is never applied except in extreme cases.        p. 169

A company which took a lease of property with knowledge of an existing contract for its lease to another, could not defend against a suit for specific performance of the contract on the ground that it had expended large sums in acquiring a lease of adjoining property, that the two properties might be used together.                                          pp. 169, 170

One who, in taking a lease of property which was already subject to a contract for a lease to another, paid to the lessor a sum which was applied by the latter to obtaining a surrender of possession by an existing tenant, was entitled, on specific performance of the previous contract being decreed, at the suit of the beneficiary thereunder, to be subrogated to the lessor's rights under the lease so decreed, he to receive the installments of rent to the extent of such payment.                        pp. 170, 173

That a contract for a lease required the intending lessee to furnish guarantors satisfactory to the intending lessor did not impose on the intending lessee, as a prerequisite to a decree in his favor for specific performance of the contract, an obligation

Md.]                         Syllabus.

to secure approval of the proposed guarantors by the intending lessor, the latter having repudiated all his obligations under the contract, and thereby showed that he would not approve any guarantor.                                              pp. 170, 171

A provision, in a contract for the making of a lease, that the intending lessee would obtain individual guarantors to the satisfaction of the intending lessor, *held,* in view of the circumstances, not to confer upon the latter the absolute right to reject guarantors, and consequently the court, in a suit for specific performance of the contract, could pass upon the satisfactoriness of the guarantors submitted.                          pp. 171-173

In a decree for specific performance of a contract for a lease, it was proper to provide that the lease, as provided in the contract, should be for a term of ten years, starting from a named date, although the decree also provided, as was proper under the circumstances, that the rent should not commence until a later date.                                           p. 173

*Decided January 21st, 1927.*

Appeals from the Circuit Court of Baltimore City (FRANK, J.).

Bill by Henry Rose and Emil Horwitz against Theodore H. Diener and the Louis K. Liggett Company. From a decree for plaintiffs, defendants separately appeal. Affirmed in part and reversed in part.

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, and PARKE, JJ.

*Robert R. Carman,* with whom were *R. Bayly Chapman* and *John B. Deming* on the brief, for the Louis K. Liggett Company, appellant.

*Edward L. Ward,* with whom was *Richard E. Preece* on the brief, for Theodore H. Diener, appellant.

*J. Morfit Mullen* and *Emanuel Gorfine,* for the appellees.

PARKE, J., delivered the opinion of the Court.

The bill of complaint on this appeal was filed in the Circuit Court of Baltimore City on January 27th, 1926, by Henry Rose and Emil Horwitz, appellees, against Theodore H. Diener and Louis K. Liggett Company, a corporation, appellants. After the bill of complaint had been amended, its final form was sustained by the overruling of the demurrers which had been interposed by the appellants, who then answered the allegations of the bill of complaint, and testimony was taken before the chancellor. The proceedings were designed to have specifically enforced an agreement of Theodore H. Diener whereby, on November 11th, 1925, he promised in writing to lease to the appellees a desirable brick store, of three stories, with basement, at the corner of Lexington and Liberty Streets, Baltimore, known as 101 West Lexington Street, for a period of ten years from January 1st, 1926, with the privilege of renewal for a like term. The agreement to lease was not consummated, but Theodore H. Diener, on January 13th, 1926, demised the same premises to the Louis K. Liggett Company, an appellant, for a period of twenty years, beginning on February 1st, 1926. The theory upon which the present appellees proceeded was that, without their default, and while the agreement between themselves and the landlord was in effect, he negotiated and agreed to make a lease of the same property to the Louis K. Liggett Company, the other appellant, which had knowledge of the prior subsisting agreement. The chancellor decreed specific performance of the agreement of Diener with the appellees, and from his decree the landlord and the company have each prosecuted separate appeals. The record is voluminous, and the oral arguments and briefs have exhaustively and ably presented the case, which, in our judgment, will depend upon whether the Louis K. Liggett Company had notice of the prior contractual rights of the appellees at the time of the execution of its lease. The court will not attempt an analysis of the conflicting testimony, but will state its carefully considered conclusions as the substantive facts established by the preponderance and weight of the testimony.

The premises in question were vacant, except a part occupied by a jeweler, Milton I. Mervis, when the landlord leased to a corporation named Dartley, Inc., another portion of the building from October 1st, 1925, to December 31st, 1925. The owner of the building was desirous of leasing the premises and he had employed a real estate agent, the Realty Service, Inc., to secure a tenant. A short time before the renting to Dartley, Inc., Emil Horwitz, one of its officers and a large stockholder, became interested in securing from the owner a lease on the whole property. The other appellee, Henry Rose, an experienced real estate operator in New York, became associated with Horwitz in this undertaking, and the two met at the owner's place of business on November 11th, 1925, where, in the presence of Sidney D. Cohen, the representative of the Realty Service, Inc., the owner himself drew up an agreement to lease the entire property, and the three contracting parties signed and delivered the instrument, which was of this tenor:

"November 11, 1925.

"I hereby agree, subject to concluding arrangements with Milton I. Mervis, to lease to Mr. Horwitz and Mr. Rose premises 101 W. Lexington Street for a term of ten years beginning January 1, 1926, at an annual rental of $24,000, payable in equal monthly installments of $2,000 in advance on the first day of each and every month. As security $10,000 are to be paid on signing of the lease, of which $2,000 are to be applied to payment of the first month's rent, the balance to be held at 6 per cent. compound interest for three years and then applied proportionately on the monthly rental for the succeeding three years. Lease to be signed by a corporation having $50,000 capital and to be individually guaranteed to satisfaction of landlord. Premises to be accepted in condition as is and tenant to have right to make any alteration or repairs that will improve the property. Two years before expiration of the lease, tenant is to have right to renew for a further term of ten years at a gross rental for the first five

years of $27,000 and for the second five years of
$30,000.

"Theo. H. Diener.

"Witness: Sidney D. Cohen.

"We hereby agree to lease the premises 101 W. Lex-
ington Street under the terms above mentioned, and
agree to execute proper lease for same.

"Henry Rose,
"Emil Horwitz.

"Witness: Sidney D. Cohen."

The contract was conditional on the owner obtaining from
his tenant, the jeweler, Milton I. Mervis, a release or sur-
render of his subsisting lease, which had some years to run;
and, as will be later more particularly stated, the owner ob-
tained from the jeweler a surrender of his term upon the
payment of a large reward.

After the agreement was signed, Rose returned to New
York, and Horwitz remained in Baltimore until Saturday,
when he left with the understanding that the lease would be
sent by Diener to New York for execution. Diener had pre-
pared a lease for all of the property, except the portion occu-
pied by the jeweler, and forwarded it to New York in a letter
dated November 14th. As explained by this letter, the form
of lease submitted was to cover all of the property except that
occupied by the jeweler, for the term of six years and one
month, beginning on the first of January, 1926, and ending
on the 31st day of January, 1932, which corresponded with
the unexpired period of the jeweler's lease. The letter stated
that another lease for the same period, with similar provi-
sions, would be drawn for the portion of the property occu-
pied by Mervis, and that this second lease would, also, cover
the entire premises for the residue of the agreed term of ten
years, with the privilege of renewal for ten years more.

The form of lease submitted contemplated a lease to the
corporation to be named by the lessees and Henry Rose as
the two tenants. In his letter of December 14th, the request
was made for the name of the corporation to be furnished,
with the suggestion that if this be then impossible, the lease

would be made in the name of Rose, "with permission to, transfer same to a corporation, subject to conditions named in lease."

The lease contained a clause that "it is further understood and agreed that the said tenants shall guarantee to the satisfaction of the landlord the payment of the rent stipulated in this lease and the payment of the rent to be paid under the fourteen-year lease to be hereinafter executed," which evidently was intended to provide for the stipulation in the agreement to lease that the lease was "to be individually guaranteed to the satisfaction of the landlord." The lease as prepared was acceptable in form to the appellees, except with respect to two provisions. The first was that any change in the name of the corporate tenant or of the personnel of its board of directors, or any assignment of its shares of stock or assets, should "be deemed and considered a violation of this lease and its provisions," and, upon the happening of any of these three contingencies, the landlord would have the right to declare the lease terminated, with the right of re-entry. The second provision was that the premises should not be assigned or sublet. Both of these provisions were not within the purview of the agreement to lease, but the appellees, though protesting, would have accepted the proposed form of lease, if the landlord had been willing to leave out the stipulation against an assignment or subletting of the premises. *Tiffany, Landlord and Tenant,* secs. 150, 151, 152; *Carlin v. Harris,* 100 Md. 50, 55; *Schlerf v. Bond,* 139 Md. 10; *Bodman v. Murphy,* 35 Md. 155.

The prohibition against assigning or subletting, especially as the proposed renting was to assume the form of distinct leases for separate portions of the same premises, was vital, and the appellees rightfully declined to acquiesce in this modification of the contract. The landlord was peremptory in his position that he would not lease to the appellees without this provision, but the discussion on this point continued until January 6th, in interviews and through correspondence, in which other matters were considered in connection with the execution of the lease, but the central and substantial

difficulty was the inexorable refusal of the landlord to rent to the appellees, unless they agreed to incorporate the condition against an assignment and sub-lease.

Meanwhile the landlord had agreed that Dartley, Inc., whose term would expire on December 31st, could remain as a monthly tenant, but on January 15th he wrote that, instead of requiring this corporation to vacate on January 31st, an arrangement could be made for an extension until February 15th. The landlord having declined to execute a lease in conformity with his agreement, the appellees, who had been acting under the advice of their attorney in New York, engaged the services of local counsel, who addressed a letter to the landlord on January 22nd, 1926, in which a demand was made upon him to carry out the contract of November 11th, 1925, according to its terms, and if he failed or refused, legal proceedings would be begun, and that such action would be taken, unless he replied to the demand on or before January 26th.

In this communication, the deposit of ten thousand dollars was offered to be deposited with the landlord; and it was stated that the appellees were willing to execute any proper form of lease, and that the one first submitted by the landlord was entirely satisfactory, if the two provisions which have been mentioned were eliminated. The appellees further particularly offered to have a corporation formed immediately with a paid in cash capital of fifty thousand dollars, and to have the performance of the lease individually guaranteed to the landlord's satisfaction. The landlord made reply, through his attorney, on January 25th, to the effect that his attitude had not changed since his letter to Mr. Rose, dated December 21st. Two days later the bill of complaint was filed, wherein the appellees again tendered themselves ready, willing, and able to comply with the terms of the agreement of November 11th, and prayed for a specific performance.

The contract to lease is assailed on the ground that it is lacking in mutuality and in certainty. It would seem reasonably clear, although not wholly free of difficulty, that the better rule would require the specific enforcement of this

contract, under the circumstances, against the landlord, if the appellees be ready, willing, and able at the time of the decree to produce a corporate lessor having a capital of fifty thousand dollars; and to provide guarantors for the performance of the covenants of the lease, against whom no reasonable grounds of objection could be made by the landlord in the exercise of good faith.

While mutuality should exist from the beginning of the contract, there is a distinction drawn by the authorities between the mutuality of right and obligation, and the mutuality of the equitable remedy; since the first is the binding efficacy of the agreement upon both the parties, and since the second concerns the right of both the parties to obtain a specific performance. "If the first does not exist when the parties have gone through the form of concluding their contract, it can hardly be said that any agreement at all has been made; any subsequent act, omission, or event, which would create a mutuality of obligation, would virtually be the making of a new agreement. The mutuality of the equitable remedy, on the other hand, does not belong to the essence of the contract. An agreement may be perfect in its obligations upon both parties, and yet be of such a nature that one of them only could be compelled, by a decree of the court, to specifically perform. As the absence of this kind of mutuality does not render the agreement any less obligatory, it would seem on principle that, if the quality originally lacking should be subsequently supplied, in any practical manner, before the commencement of the suit, or even, perhaps, before the hearing, the objection would then be removed and a specific enforcement would be thus made possible." *Pomeroy's Specific Performance* (3rd Ed.), sec. 166, pp. 429, 430, secs. 171, 172, 173; *French v. Boston Nat. Bank,* 179 Mass. 404.

In *Maryland Construction Company v. Kuper,* 90 Md. 529, the appellant, on January 18th, 1897, sold to the appellee some lots of land, which were to be paid for and conveyed at the expiration of thirty days from the day of sale, and, on the vendor tendering a deed, the purchaser declined to accept, and, on a bill for a specific performance, interposed

the defence that the contract of sale was unenforceable because of a failure of mutuality in the contract. The Maryland Construction Company was engaged in building for the Baltimore and Ohio Railroad Company the Baltimore Belt Railroad. The Baltimore and Ohio Railroad Company held all the stock of the construction company and was its large creditor. The Baltimore and Ohio Railroad Company was in the hands of receivers, who applied to the federal court for permission to secure funds for the construction company by the issue of a large amount of certificates of indebtedness, dated December 1st, 1896, and payable three years thereafter, and the court authorized the issue, provided that the receivers, as a condition precedent, should require the construction company to execute to the receivers a declaration of trust to the effect that the receivers should hold all the property of the construction company for the benefit and protection of said receivers, wihout power of sale or other right of disposition by said construction company, except by consent of the receivers in writing, and further that the proceeds of sale should be paid to the receivers. On the 27th day of November, 1896, the construction company executed in accordance with the decree this declaration of trust, which was duly recorded. It was on account of this situation that the buyer contended there was no mutuality in the contract, as the agreement of sale to him was not signed by the receivers but only by the construction company.

It is to be observed that the mutuality of right and obligation of the contracting parties was complete on the face of the contract of sale, and it was binding upon both parties, but, by reason of the declaration of trust by the construction company to the receivers, the mutuality of equitable remedy did not exist at the time of the treaty of sale, because the ability of the vendor to comply with its contract to convey was dependent upon the condition of the construction company being able to secure, after the formation of the contract, the consent to the sale by the receivers, who acted in the representative capacity of officers of the court,

and their union in the deed of conveyance from the construction company to the buyer. This Court held that the construction company could maintain its bill for specific performance since, after the delivery of the contract, the receivers had consented in writing by uniting with the construction company in the proffered deed to the buyer for the lots sold. The Court, after reviewing *Duvall v. Myers,* 2 Md. Ch. 401, and a number of other cases, said: "The authorities are therefore ample to establish the doctrine that the mere fact that the vendor's property is encumbered, or his title is defective, at the time the contract of sale is made, will not prevent his enforcing the contract in equity, if he has removed the incumbrance and perfected the title by the time he is required to convey it, and generally, when he has acted in good faith relief will be granted him, if he is ready to furnish a clear title at the time of the decree, provided the delay has not prejudiced the purchaser and time is not of the essence of the contract." Page 543.

And it may now be said to be well established by the decisions of this Court that an agreement upon condition, which might not be enforced at its inception and for some time thereafter, because the performance of the condition had not been fulfilled by the obligee, may be specifically enforced by the obligee, if he has acted in good faith, and if at any time previous to the decree he is able to complete the performance of the condition. *Swartz v. Realty Co.,* 106 Md. 290, 297; *Hammer v. Westphal,* 120 Md. 15, 18; *Caplan v. Buckner,* 123 Md. 590, 601; *Southern Real Estate Co. v. Strub,* 128 Md. 513, 521; *Dixon v. Dixon,* 92 Md. 432, 442, 443, 437; *Thomas v. G. B. S. Brewing Co.,* 102 Md. 417; *Brewer v. Sowers,* 118 Md. 681, 689; *Hensel v. Calder,* 135 Md. 487, 490-493; *Keys v. Keys,* 148 Md. 397, 401; *Schapiro v. Howard,* 113 Md. 360, 377; *Offutt v. Offutt,* 106 Md. 236; *Miller's Equity,* sec. 686.

This rule is subject to the general qualifications that time is not of the essence of the contract and, when it is not, that the delay in fulfilling the condition or perfecting the

title was not intentional, unreasonably long, and such as to prejudice the rights of the other party. *Supra; North Avenue Land Co. v. Baltimore,* 102 Md. 475, 483-485.

The chancellor found that the appellees had acted in good faith, and the evidence supported this conclusion. Although the contract to lease was one where, from its object and the nature of its subject matter, time was of the essence of the contract, yet the right of the lessor to refuse to perform his contract to lease, because the lessee had not made an actual tender of an executed lease with a lessee and guarantors and money deposit, as required by the contract, before January 1st, 1926, was not an absolute right, but one which could be lost by his conduct, as where the delay was caused by his default. The proof is clear that, if the lessees had made the tender, it would have been a useless form, because the lessor had openly and firmly refused to consider the execution by him of any lease which did not contain the stipulation against an assignment or sublease.

The decided weight of evidence is that the appellees were ready, before bringing the suit, to comply with the conditions as was originally contemplated by the parties, and the failure of the contract to be performed within the time fixed was wholly the default of the proposed lessor, who without any just or sufficient reason notified the appellees that he would not perform the contract. Under such circumstances, the owner loses his right to treat the agreement to lease as at an end because the other parties fail to go through a nugatory ceremony. *Irving v. Gregory,* 13 Grey 215, 218; *Elbert v. Arends,* 190 Ill. 221; *Dynan v. McCulloch,* 46 N. J. Eq. 11; *Bauman v. Pinckney,* 118 N. Y. 604; *Pomeroy's Specific Performance* (3rd Ed.), secs. 405, 409, 337; *Maryland Construction Co. v. Kuper,* 90 Md. 529, 549; *Lawson v. Mullinix,* 104 Md. 156; *Gunton v. Carroll,* 101 U. S. 426, 25 L. Ed. 985. On the facts of the record, as the Court finds them, the failure of the appellees to perform their contract by the time designated was caused by the indicated default of the person against whom specific

performance is sought, and he cannot now set up a delay caused by his own default to defeat a proceeding rendered necessary by that default. *Budacz v. Fradkin,* 146 Md. 400, 407-408; *Brewer v. Sowers,* 118 Md. 681, 683, 687; *Cheney v. Libby,* 134 U. S. 68; *Morse v. Merest,* 6 Madd. 26.

A ground assigned for the contention that the contract itself was uncertain is that the appellees agreed to execute a "proper lease" for the premises. This agreement follows the signature of the landlord, and relates to the body of the contract, wherein its terms are set out. Any uncertainty is removed by reference to the context of the contract, where the terms upon which the renting is to be made are stated, and the meaning of a "proper lease" is made plain to be simply that the lease shall set forth these terms in an adequate manner by an instrument of writing in legal form. *Id certum est quod reddi certum potest.* 1 *Tiffany on Landlord and Tenant,* secs. 67, 68. The contract definitely sets forth the necessary elements of a valid lease, and is enforceable even if it should not contain all the usual averments of similar demises. *King v. Kaiser,* 126 Md. 219; *Read Drug and Chem. Co. v. Nattans,* 129 Md. 67, 71; 130 Md. 471; *Thomas v. Thomas & Thompson Co.,* 132 Md. 484; 1 *Tiffany, Landlord and Tenant,* sec. 67, p. 393; *Caplan v. Buckner,* 123 Md. 602.

No matter what may have been the prior equitable estate or other interest of the appellees in the property of which Louis K. Liggett Company subsequently acquired a demise, the title of the latter is indefeasible if it was acquired in good faith, for value, and without notice. The claim of the appellees is founded upon a paper writing whose form did not entitle it to be recorded, and as the demise to the Liggett Company was upon a valuable consideration, it will prevail, unless the company had actual or constructive notice of the prior equity of the appellees. *Pomeroy's Eq. Jur.* (4th Ed.), vol. 2, par. 767, p. 184; vol. 1, par. 200, p. 288; *Price v.*

*McDonald,* 1 Md. 414; *Stanley v. Schwally,* 162 U. S. 276; *McNamara v. Feihe,* 139 Md. 520; Code, art. 21, sec. 29.

The contention of the appellees is that constructive notice of the agreement of November 11th was acquired from the possession of Dartley, Inc., which was the lessee of a part of the premises from the owner Diener for a period of three months, expiring on December 31st, 1925, and thereafter from month to month. The doctrine is that possession of the land is notice of the rights of the party in possession to the extent they would have been ascertained upon inquiry. The extent of this imputed knowledge is limited to those rights which are asserted under subsisting relations of the party in possession and the owner of the land, and so to some actual outstanding title, or equitable interest, and should not be extended to those which might arise from a non-existent, different, and merely anticipated status with a third party. *Duvall v. Wilmer,* 88 Md. 66, 76, 77; *Wicklein v. Kidd,* 149 Md. 412; *Fuller v. Brewster,* 53 Md. 358; *Gross v. King,* 150 Md. 291; *McNamara v. Feihe,* 139 Md. 516; *Alexander v. Ghiselin,* 5 Gill (Brantly Ed.), note p. 138; *Hurwitz v. Buck,* 147 Md. 566; 2 *Pomeroy's Eq. Jur.* (4th Ed.), sec. 609, p. 1183; *Shipley v. Fink,* 102 Md. 219, 228. It follows that the knowledge of the resident manager of Dartley, Inc., that the appellees had entered into the contract of November 11th with its landlord, and that, when and if the appellees obtained their lease of the premises from the landlord, the appellees were expected to rent for a long term to Dartley, Inc., the premises the latter then occupied, was too remote, uncertain and speculative to be imputed from the mere possession under a different and accepted legal relation; and, moreover, was something the resident manager was under no duty to disclose upon the inquiry of Louis K. Liggett Company.

The appellees further argue that the Liggett Company acquired constructive notice of their contract by an interview in New York on November 13th between Monahan, its employee, and Rose, an appellee, and a business associate named

Ball.  Accepting the version relied upon by the appellees, Rose and Ball went to the office of the company, and inquired for some one in charge of its out of town real estate department, and were introduced to Monahan, whom they informed Rose held a lease on the premises here in controversy, and inquired if his company would be interested in the location. Monahan stated that his company had considered the site, and had found it did not afford sufficient floor space and had secured another location.  The testimony of Rose and Ball is that Monahan informed them that he was the manager or assistant manager of the out of town real estate department. They were uncertain with respect to which office he claimed to fill, but that is immaterial, as his own declarations were insufficient to establish his agency.  *Culver v. Nichols,* 140 Md. 448, 452; *Roland v. People's Bank,* 134 Md. 218, 220. The fact is that Monahan was one of four clerks in the real estate department, and that its head was one Masters, who alone had the right to initiate, conduct, and submit to the executive committee for its authorization the corporate leases. Monahan did not communicate this conversation to Masters or to any other officer or director, nor did it have such present importance or pertinency as would cast upon the clerk the duty to report it to his superior officer, who was clothed with the power to act in such matters.  The property in question had been considered and rejected by the corporation as not available for its purposes a short while before, and was a closed incident so far as Monahan knew.  It is not claimed that Monahan was empowered to conduct the treaty for the purchase or lease of any property for his corporation, or that with such affairs he was charged with any special duty; nor did he then, nor did he at any future time, conduct or participate in any negotiations for the lease, which was, however, some weeks later acquired by the corporation through some other agent of a different and superior class.  Under these particular circumstances the uncommunicated knowledge of Monahan was not imputed to the corporation.  2 *Mechem on Agency* (2nd Ed.), secs. 1850, 1843.

The third and final ground to impute notice to the Liggett Company is because of the relation of principal and agent existing between the company and Howard Richards, a real estate broker of Baltimore City. The appellants have urged that the broker was the agent only of Diener, but the learned chancellor disagreed, and we fully concur in his determination. Stress is, also, laid upon the point that brokerage fees to the amount of about ten thousand dollars depended upon the success of the broker's efforts, and that this made his interest adverse to the Liggett Company, so that even if the broker were its agent the principal would not be charged with the knowledge of the agent acquired in the transaction. There is no fraud or adverse interest assigned beyond the implication that the broker's greed for commissions was sufficient to seal his lips. But this temptation was known to the Liggett Company, because, beyond declining to enter into any negotiations for the leases involved in their plan with any other broker than Richards, the company insisted that the lessor should pay the commissions. This refusal to deal, except through the broker of its choice, was of itself a valuable consideration to the broker, since the nature of the company's enterprise made it a frequent customer for business sites in Baltimore, and the position of the company was the cause of the broker's employment. Both sides were perfectly aware of the nature of the broker's employment and his relations to each, and so, in the language of a distinguished authority: "If, however, each having full knowledge of his relations to the other, sees fit to trust him to bargain for him, there is no legal objection to such a course, and neither principal could complain." *Mechem on Agency* (2nd Ed.), secs. 2412, 2413, 178, 1592; *De Crette v. Mohler*, 147 Md. 108, 115-117. Nor will the principals be permitted afterwards to escape the consequences of this double employment and so, both being interested in the same subject-matter, concerning which the agent owed a duty to each, notice to the agent is notice to both his principals in accordance with the ordinary rules. 2 *Mechem on Agency* (2nd

Ed.), sec. 1837. Richards had seen the agreement between Diener and Rose and Horwitz, dated November 11th, 1925, and knew its terms, but the testimony is that he did not communicate this knowledge to Masters, the real estate agent of the Liggett Company, to Watt, its vice-president, or to any one connected with the company. However lamentable this silence in the discharge of his duty to his principal may be, it would nevertheless be a repudiation of the fundamental principles of agency and of justice to entertain the proposition that such a non-disclosure by an agent could be the shield of the principal, while it encompassed the destruction of the contractual rights of a third party.

The representatives of Liggett Company and the broker deny that the relation of principal and agent existed between them, and the landlord testified that the broker was his agent, and they all unite in the statement that the broker's sole compensation will be the commissions paid by the landlord. The chancellor did not accept this testimony as the basis for his judgment, and evidently based his finding on the more reliable evidence of the contemporaneous writings of the witnesses. On July 14th, 1926, the Realty Service, Inc., a real estate brokerage company then employed by the landlord, wrote a letter to Liggett Company offering, without disclosing the exact location, the property in question, stating it was the best corner on Lexington Street, in the center of the shopping district, but that the property was not on the market. The communication closed with the statement that the matter "must be treated strictly confidential, and it is therefore necessary to work exclusively through this office." The Liggett Company did not answer the broker, but, on July 16th wrote to Richards from New York to this effect:

"July 16, 1925.

"Dear Richards:

"While they ask that the enclosed be kept in strict confidence, I feel that you are really our representative in Baltimore, and I am therefore turning this over to you.

"If you feel that I should handle it direct, will you
return this letter to me.

"Sincerely,

"W. Watt."

Mr. Watt was the vice-president of the company and was
its executive officer in charge of such corporate transactions;
and Richards undertook the business in hand instead of
having it conducted by the company's officer, because he re-
plied to that effect in a letter dated July 18th, in which he
disclosed his familiarity with the property, and wrote:

"I have had my eye on this proposition for you in
conjunction with No. 103 W. Lexington Street, which
is now under lease to the Newark Shoe. These two
properties together would give you a very decent lay-
out, but I fail to see where No. 101 W. Lexington
Street by itself would be of any value."

The letter further pointed out the possibility of acquiring
both properties by lease, and stated that the writer would take
the matter up with Sidney D. Cohen, the representative of
the Realty Service, Inc. On July 22nd Richards wrote to
Cohen:

"I happen to represent the Louis K. Liggett Com-
pany here and in consequence of that fact, your letter
of July 14th was forwarded to me for attention. I shall
be glad to have an interview with you."

Richards kept in touch with the situation and in contact
with the Liggett Company, but did not definitely submit the
matter to the company until he was in a position to secure
leases on both properties by obtaining surrenders of existing
tenancies for a reward to the several tenants. This was in
accordance with the plan outlined in his letter to the company
of July 18th, and so in October Richards was actively en-
gaged in securing leases on both 101 and 103 W. Lexington
Street for the company, with the result that he obtained a
lease for the company on 103 W. Lexington Street at the
same time he procured a lease for the company on 101 W.

Lexington Street. The tenor of the correspondence between the broker and the company is consistent with the theory that the broker was the representative of the company, and when the official of the company having the matter in charge was in the West, the broker obtained a delay from the owners of the properties until his return, and wrote on December 14th to the company that he succeeded in getting Diener and Eisenberg, the owners of the two properties "to hold. this matter open for me" until the return of Mr. Watt on December 21st, and that he would either call at their office in New York on the 21st or 22nd, or communicate by letter and telephone to Mr. Watt on December 22nd. He wrote a second and later letter on December 14th to the company, saying that he had "finally gotten the property No. 103-105 West Lexington Street worked out, provided you take possession January 1st, 1926," but that he would postpone the matter until the return of Mr. Watt "so that I can sit down and talk the proposition over, as there are many angles to it which I think can more clearly be understood in a conference than by putting them in a letter." The record is not clear as to what took place between the broker and the Liggett Company, beyond the fact that the transaction as submitted by the broker was authorized by the executive committee, and, pursuant to this authorization, its vice-president Watt telegraphed Richards on December 29th, "Agree to go ahead on location we have been talking about." On January 5th, Richards wrote he hoped to send the papers by Thursday, saying, "at any rate, I have gotten Mr. Eisenberg, the owner of No. 103, back in line and apparently everything looks like smooth sailing ahead," and on January 13th, 1926, the legal department of the company forwarded to Richards the leases for the two properties; the assignment of the lease of M. Samuels & Company on a part of the 103 W. Lexington Street or Eisenberg property, and a cancellation and surrender of the lease of John T. Selby on another part of 103 W. Lexington Street property; and a check to M. Samuels & Company for $15,000, and another to John T. Selby for $3,500, the two being the price paid to clear the Eisenberg property

of the outstanding leases; a check to Abraham Eisenberg, trustee, for $3,000 as rent for three months in advance; and a check to Theodore H. Diener for $26,666.66, which was the consideration for the lease in addition to the rent reserved and its other covenants. The leases had been executed by the Liggett Company, and they and all the papers were entrusted to the broker to secure their due execution, and he was instructed not to deliver any of the checks until he had received all of the instruments properly executed. These instructions were carried out, and the Mervis lease was ended by the payment to him of the agreed price of $22,500 by Diener out of his check for $26,666.66.

There is no occasion further to dwell on the evidence, as the conclusion is inevitable that the broker was employed by the Liggett Company to procure leases for a suitable business site through the combination of the premises known as 101 and 103 W. Lexington Street, and that pursuant to this employment he obtained the execution and delivery of the desired leases upon terms which were satisfactory to his employer, with the knowledge and consent of the lessors and the lessee that the commissions were to be paid by the respective lessors. Under these circumstances, the knowledge of the agent, although uncommunicated, is the knowledge of the Liggett Company, and it was affected with notice of the rights of the appellees which became known to the agent in the course of his undertaking. The nature of these rights and the repudiation of them by the owner's course would prompt him to misrepresent or deny them on inquiry, and, therefore, a party who would have failed in making inquiry of the appellees would have been guilty of such negligence that knowledge would be imputed to him, although inquiry had been made of the landlord and all rights of the appellees had been declared by him, without proof or other supporting circumstances, to have been forfeited or abandoned. *Price & Bevans v. McDonald,* 1 Md. 403, 418, 419; *Devries & Co. v. Shumate,* 53 Md. 214; *Peninsula Trust Co. v. Johnson,* 128 Md. 540; *Maryland Trust Co. v. Mechanic's Bank,* 102 Md. 608; *Engler v. Garrett,* 100 Md. 387; *Waters v. Wambach,*

140 Md. 256; *Smoot v. Rea,* 19 Md. 398, 412; *Cole v. Cole,* 41 Md. 301; *Schwind v. Boyce,* 94 Md. 510, 517; *O'Sullivan v. Buckner,* 107 Md. 33, 37; *Thistle Mills Co. v. Bone,* 92 Md. 56, 57; *Abrams & Cochran v. Sheehan,* 40 Md. 446, 457; *Green v. Early & Townshend,* 39 Md. 223, 229-231; *Balto. v. Whittington,* 78 Md. 231, 237-238.

The Liggett Company, accordingly, acquired the lease with notice of the prior contract to lease to the appellees, and, therefore, was subject to the same equity, stood in the same place, and was bound to do what the lessor, whom it represents, would be bound to do by a decree for specific performance. The company's defense against the effect of this situation is to invoke the familiar equitable principles that relief by way of specific performance is not a matter of absolute right, but rests in the sound discretion of the chancellor, who will refrain from the employment of the writ if it will operate harshly and oppressively.

The cause of the company's asserted ignorance of the prior equity of the appellees was its own carelessness in failing to make inquiry and have the land-owner's title and possession investigated. It apparently asked no questions, but committed all its interests to the protection of its agent, who had charge of the transaction in detail from the beginning. The appellees made no effort to conceal from the company their contract for a lease, and if untoward consequences have resulted, the company must assume the responsibility alike for its own neglect and the default of its agent. The appeal to the discretion of the chancellor is not to an arbitrary, capricious, or favorable discretion, but to a sound judicial discretion, which will not be exercised except in accordance with established principles of equity, when considered in connection with all the circumstances of the particular case. *Diffenderfer v. Knoche,* 118 Md. 189, 194, 195; *Rickard v. Neff,* 130 Md. 89, 94-95; *Henneke v. Cooke,* 135 Md. 417, 419; *McLaughlin v. Leonhardt,* 113 Md. 262, 273. So, if at the time it was entered into, a contract to sell or lease real estate is in writing and is complete, cer-

tain, and fair and equal in all respects, for an adequate consideration, and capable of being performed, it is as much a matter of course for a court of equity to decree specific performance as it is for a court of law to give damages for its breach. *Warren Manfg. Co. v. Baltimore,* 119 Md. 188, 205; *Lucas v. Long,* 125 Md. 420, 427; *Rogers v. Dorrance,* 140 Md. 419, 425-426; *Budacz v. Fradkin,* 146 Md. 400, 407; *Cochran v. Pascault,* 54 Md. 1, 18; *Hall v. Warren,* 9 Ves. 605; *Fry on Specific Performance* (6th Ed.), sec. 389; *Pomeroy on Specific Performance,* secs. 177, 178.

As this opinion has pointed out, the contract to lease made by Diener to the appellees possessed all these elements requisite for its enforcement in equity, under the general rule mentioned, since the requisite quality of mutuality of remedy had been supplied by the fulfilling of the conditions of the contract, and the conduct of the appellees had not affected their right to compel its specific performance, unless this action should inflict upon the Liggett Company an injury far greater than the appellees would derive benefit.

The hardship which the Liggett Company invokes as a bar to specific performance did not exist at the time of the inception of the contract between the land-owner and the appellees, nor is it attributable to the appellees subsequent to the formation of this contract, but it is wholly due to the fact that the Liggett Company, with knowledge, through its agent, of the prior equity of the appellees, entered into the leases with Diener for 101 West Lexington Street, and with the Eisenberg estate for 103 West Lexington Street, and secured the unexpired terms of the subsisting leases of the Eisenberg property. The hardship relied upon arose wholly from the acts of the Liggett Company, a stranger to the contract, after the contract in question, and in defiance of its provisions and of the rights of the appellees, which the contract at once declared and secured. It is rather difficult to see upon what sound equitable principle the appellant here is in a position to ask that the appellees be denied the relief sought. It is true that the decisions of this Court

have established the rule that specific enforcement of an agreement will not be decreed when "the injury to the defendant would be far greater than the benefit the plaintiff might derive from that result." *Smith v. Myers*, 130 Md. 64, 67. This rule is an extension of the equitable doctrine that specific performance of a contract will not be enforced if the result would be to impose great hardship on either party to it, although the party seeking specific performance may be free from the least impropriety of conduct. *Fry on Specific Performance* (6th Ed.), secs. 417-436. Compare *Pomeroy on Specific Performance* (3rd Ed.), sec. 185, note a, page 476. But it must be observed that the rule here invoked is exceptional, and has never been applied save in extreme cases, where, in the language of the opinion of the Court in *Texas Co. v. U. S. Asphalt Co.*, 140 Md. 350, 357, the relief prayed would injure the defendant "to an extent wholly disproportionate to the benefit which might enure to the plaintiff from such action." So in *Smith v. Myers*, 130 Md. 64, 67, this Court refused a mandatory injunction to compel the removal of a fifteen hundred dollar building in order that a burial lot, twenty feet wide and twenty-four feet long, and costing twelve dollars, be relieved from the encroachment of this building to the extent of a triangular strip having a base of eighteen inches and an altitude of eighteen and one-half feet, the encroachment having existed at the time of the buying of the lot. Again, in *Linthicum v. Wash., B. & A. Electric R. Co.*, 124 Md. 263, the plaintiff was refused specific performance of a covenant to construct railway crossings for the benefit of the plaintiff's land in precisely the manner required by the covenant, which would have entailed an expenditure by the defendant of an amount equal to, if not more than, the value of the plaintiff's land, which was about fifteen thousand dollars. And see *Fralinger v. Cooke,* 108 Md. 682, 688; *McDowell v. Biddison,* 120 Md. 118.

The Liggett Company did acquire a lease from the Eisenberg estate for 103 W. Lexington Street, and the subsisting

terms in that property of M. Samuels & Company and of John T. Selby, for the purpose of combining that property with the premises here involved, and paid therefor eighteen thousand and five hundred dollars and committed themselves to the obligations of the lease, but there is no reason to assume that, at the time of these transactions, the value of what they obtained was not indicated by the price they paid, even if the contrary could be considered in the determination of the rights of the parties under another separate and distinct, although contemporaneous and associated, transaction. *Rogers v. Dorrance,* 140 Md. 426; *Lucas v. Long,* 125 Md. 427. The acquisition of the lease from Diener for 101 W. Lexington Street stands on a wholly different footing, but we find that out of the sum of twenty-six thousand six hundred and sixty-six dollars and sixty-six cents received by Diener from Liggett Company for the execution of the lease, the sum of twenty-two thousand and four hundred and fifty dollars was paid to Milton I. Mervis, tenant, for his agreement to surrender possession of the property to Diener in order to enable the lease to be made. As this payment must have been made by Diener before he could have given to the appellees the lease they were entitled to, the Liggett Company should be subrogated to the rights of the landlord under the lease to the appellees to the extent of this payment. This leaves unsecured the sum of four thousand two hundred and sixteen dollars and sixty-six cents, as of the date of the settlement, which, when weighed in the balance with the rights of the appellees under the lease they should have, is too small an amount, under all the facts and circumstances, to render the enforcement of the contract in question harsh and oppressive against the appellants, within the rule as stated and applied by the cases cited.

A number of other points have been made which have been considered but, in the view we have taken of this record, it is unnecessary for this decision to discuss any but the following. The objection made that the form of the guaranty approved by the chancellor would discharge the guarantors in the event the lessees would assign or sublet the premises

seems to be unfounded on authority.   1 *Tiffany, Landlord and Tenant,* sec. 181, sub-sec. 5, pp. 1141-1144.   The appellants declare the decree to be wrong because the chancellor did not first seek and obtain the landlord's approval of the corporate lessee and his expression of satisfaction with the guarantors of the lease.   The landlord's right in this connection imposed its correlative obligation of fairly and honestly judging the acceptability of the contemplated guarantor, and when he declined to recognize this or any duty under his contract with appellees and, repudiating all his obligations, drove the appellees to litigation to enforce them, he cast upon the court the burden of determining if the conditions of the lease had been fulfilled according to the standard of good faith, reasonableness, and financial responsibility.   The court will not permit one party to lose the benefit of his contract through a reliance by the other party upon the latter's disregard of his contractual obligation.   It would be beyond the range of probability that the owner, who had rejected the contract, would, in the course of his final stand against its enforceability, approve any guarantor whatsoever.   Equity does not exact a vain ceremony.   To reverse the chancellor on this ground, when his judgment as to the guarantors rested upon the proof taken on that subject, would give the landlord another opportunity to denounce the contract, and thus induce a second phase of this controversy.   The owner's position, however, is that, by the express provision of his contract, no one, not even the chancellor, can undertake to pass upon the satisfactoriness of the guarantors, even if the owner has repudiated his contract.   The construction sought is that by the instant contract the guarantors had unqualifiedly to be satisfactory to the owner, and hence no one else could express an approval, on the theory that the owner had reserved to himself an absolute freedom of choice, beyond any contention and not subject to any control or investigation, and therefore, it is argued, no one else may be delegated or assume that function.   *Balto. & O. R. Co. v. Brydon,* 65 Md. 226.   But see *Latrobe v. Winans,* 89 Md. 636, 649-651.

In our judgment this position cannot be maintained.   The

contract in question compelled the appellees to procure ten thousand dollars in funds, a corporate nominee, having a capital of fifty thousand dollars, as the lessee, and individual guarantors who would be satisfactory to the owner, before the appellees would be in a position to secure the contemplated lease. These pre-requisites, the object of the lease, the large rental reserved, the right of renewal, the valuable subject-matter, the necessity of the owner to secure the release or surrender of the outstanding term of his tenant Mervis, and the other immediate circumstances, all tend to demonstrate that the intention of the parties was not to confer upon the owner the absolute and unreviewable right to reject the guarantors without reasonable cause. A satisfactory guarantor, therefore, was not a matter for the caprice, the sentiment, or arbitrary choice of the owner, so that the latter's good faith could not be inquired into if he were dissatisfied, but it was primarily a question of utility, with particular reference to the integrity and financial responsibility of the submitted guarantors. The inquiry to be made, pursuant to the present contract, into, and determination of, the satisfactoriness of a guarantor, meant that it was to be conducted by the fair mind of a reasonable man, who had sufficient experience and knowledge to pass upon such matters. Hence, if the appellees performed their obligations, the owner was bound to discharge his own not capriciously, arbitrarily, and without reason, but fairly, honestly, and reasonably, with the single purpose of passing upon the competency and adequacy of the proposed guarantors. But should the owner unjustifiably decline to act, there is no doubt that the court, after being advised by a master or by taking proof, as in the instant case, could, without difficulty, pass upon the satisfactoriness of the guarantors submitted. It follows that there is no solid basis upon which equity should refrain from decreeing a specific execution of this contract and approve the guarantors, which is a subsidiary stipulation of the contract. *Coale v. Barney,* 1 G. & J. 324, 344. See 1 *Williston on Sales* (2nd Ed.), sec. 191, and cases cited; *Pittsburgh Amusement Co. v. Ferguson,* 100 App. Div. 453, 91 N. Y. Supp. 666;

*Goldberg v. Feldman,* 108 Md. 330, 336, 337; *Latrobe v. Winans,* 89 Md. 636, 649-651; *Brummel v. Realty Co.,* 146 Md. 56, 64; *Bosch Magneto Co. v. Rushmore,* 85 N. J. Eq. 93; *Pember v. Mathers,* 1 Brown Ch. 52; *Union Pac. R. R. Co. v. Chicago etc. R. Co.,* 564, 600, 604; *Jones v. Parker,* 163 Mass. 564; *Smith v. Peters,* L. R. 20 Eq. 511, 513, 514; *Williams v. Brisco,* L. R., 22 Ch. Div. 441. See able discussion of Bond, C. J., in *Devoine Company, Inc., v. International Company, Inc.,* 151 Md. 691.

Another objection was taken to the lease beginning to run from February 1st, 1926, although the rent was to start with June 1st, 1926. The contract was for a term of ten years beginning with January 1st, and this should remain the starting point for the computation of the term, although the beginning of the payment of the rental is a matter for the decree to determine. The chancellor decided that, under all the circumstances, there was no demand arising under the lease which either the appellees or the owner would be entitled to make before June 1st, and we concur in that conclusion as equitable, but all similar matters intervening since the date of his decree should be disposed of by the chancellor before the lease is executed, and that matter may be dealt with on the remand of this cause. *Bankart v. Tennant,* L. R., 10 Eq. Cases, 141, 150, 151.

In order to provide for the prompt repayment of the sum of twenty-two thousand, four hundred and fifty dollars, which, in effect, was advanced by the Liggett Company for the surrender of the term of Mervis, the decree of the chancellor should be so modified as to direct that, out of the sum of ten thousand dollars deposited in court by the appellees, the sum of two thousand dollars applicable to the first month's rent should, on the execution of the lease, be paid by the clerk to the Liggett Company; and that the installment of rents falling due next thereafter be paid to the clerk until, with said sum of two thousand dollars, a total of twenty-two thousand four hundred and fifty dollars, with interest from January 13th, 1926, be so paid; and that the said sum so

paid shall be in turn paid by said clerk to the Liggett Company, with leave to the landlord to pay the whole amount remaining due at any time. 25 *R. C. L.,* pp. 343, 344.

Having dealt with all other questions properly presented and requiring discussion, it remains to say that the demurrers to the amended complaint were rightly overruled on the principles set forth in the opinion.

It follows that the decree of the chancellor will have to be modified somewhat so as to conform to this opinion, and, although it is affirmed on the principal questions, a remand is necessary.

> *Decree affirmed in part and reversed in part, with costs to be paid by the appellants, and cause remanded for a modification of the decree in conformity with this opinion and for such further proceedings as may be necessary.*